## In re VILLAGES AT CASTLE ROCK METROPOLITAN DISTRICT NO. 4, Debtor.

### Bankruptcy No. 89–B–16240–A.

United States Bankruptcy Court, D. Colorado.

May 11, 1990.

James B. Holden, Sherman and Howard, Denver, Colo., for debtor.

Richard S. Kitchen, Sr., pro se.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER ON OBJECTIONS TO PETITION UNDER CHAPTER 9

SIDNEY B. BROOKS, Bankruptcy Judge.

On April 5, 1990, a hearing was held on the Objections to Petition Under Chapter 9 filed by Richard S. Kitchen, Sr., Gerald D. Goldberg, Arthur D. Foster, and Joanne L. Andrews Pappas and Chris J. Pappas (collectively referred to as "Objectors"). Pursuant to B.R. 7052 and 9014, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. The Villages at Castle Rock Metropolitan District No. 4 ("District 4" or the "District") filed a Chapter 9 Petition in this Court on December 1, 1989.

2. Notice of the Chapter 9 filing was provided to creditors pursuant to 11 U.S.C. § 923, in part to give creditors an opportunity to object to District 4's Petition pursuant to 11 U.S.C. § 921(c). Richard S. Kitchen, Sr. filed a timely and detailed objection to District 4's Petition. Gerald D. Goldberg, Arthur D. Foster, and Joanne L. Andrews Pappas and Chris J. Pappas each filed timely objections which simply re-ferred to and adopted Mr. Kitchen's objection.

3. Mr. Kitchen, the only Objector who participated at the April 5, 1990 hearing on the objections, presented a determined and articulate case opposing the District's Petition. Principally, Mr. Kitchen argued and presented evidence on the allegations that: (1) the District has not been authorized, in a legally sufficient manner, to petition the United States Bankruptcy Court as a Chapter 9 debtor, and (2) the District is neither insolvent nor unable to pay its debts as they mature, and (3) the District has not negotiated, pre-petition, in good faith with its creditors. Each of Mr. Kitchen's principal objections is premised on a specific statutory requirement of prospective, qualified Chapter 9 debtors. 11 U.S.C. § 109(c)(2), (3) and (5).

4. District 4 is a political subdivision of the State of Colorado, created in 1984 pursuant to Article 1 of Title 32, Colorado Revised Statutes. District 4 was created for the purpose of acquiring and constructing water improvements, sewer improvements, street improvements, safety protection services, park and recreation improvements, and transportation services for The Villages at Castle Rock Metropolitan Districts Nos. 1 through 9.

5. Virtually all of District 4's indebtedness involves four bond series issued by District 4 for the purpose of financing or refinancing improvements of the type described above. The four bond series and the principal amount of each series are as follows:

| Series A | $ 5,175,000 |
| Series B | $ 5,275,000 |
| Series C | $ 9,950,000 |
| Series D | $10,775,000 |

No preference exists among these series. The Series A, B, and C bonds are held by a small number of "institutional" investors, while the Series D bonds are held by several hundred "retail" investors.

6. Revenues of District 4 are received from other districts with whom District 4 has entered into governmental financing agreements. These districts are The Vil-

lages at Castle Rock Metropolitan District Nos. 1 and 9. The primary source of revenues to date has been The Villages at Castle Rock Metropolitan District No. 1 ("District 1"), which has been the site of a residential development known as Founders Village.

7. District 4's repayment of its bonds was premised on adequate development of the districts with whom District 4 has entered into intergovernmental financing agreements. As residential development proceeded, particularly in District 1, tap fees would be charged to developers by District 1 and would be paid to District 4 pursuant to the intergovernmental agreements. The development of homes also would increase the ad valorem taxes paid to District 4 pursuant to the intergovernmental agreements. The bond financings included funds which were used as an interest reserve and which permitted the timely payment of bonds during the first few years when tap fees and ad valorem taxes would be insufficient to service the bonds. However, the Denver housing market has experienced a downturn and the development projections on which repayment of the bonds were premised have not been realized.

8. All but $114,470 of District 4's interest reserves were distributed to bondholders on December 1, 1989. District 4 has approximately $294,300 of cash on hand, only some of which is pledged to the bondholders. District 1 has approximately $24,700 of cash on hand.

9. The assessed value of residential property in District 1 is $7,240,756. At the current mill levy of 32 mills, ad valorem taxes received by District 1 in 1990 and paid to District 4 should total approximately $231,704. Other property supporting District 4's bond payments is used for agricultural purposes and generates minimal revenue.

10. The average residence in District 1 has a market value of approximately $85,000 and an assessed value of $13,600. The 1989 mill levy of 30 mills yielded approximately $408 per household for District 4. The District projects that to fully satisfy its bond obligations, the current mill levy would have to be increased manifold and ad valorem taxes increased to, perhaps, $15,000 or more per household.

11. District 4 currently is in technical financial default under the terms of its agreements with bondholders. District 4 has, evidently, been unable to replenish a one-year interest reserve which was largely depleted in 1989. District 4 has not, at this time, yet defaulted on any of the payments to bondholders it is required to make. Mr. Gene Myers, President of District 4, testified that District 4 is required to make a payment to its bondholders on June 1, 1990 of approximately $1,750,000. Mr. Myers further testified that District 4 does not have the funds at this time to make that payment, and it is highly unlikely it will have or can amass such necessary funds when the payment becomes due on June 1, 1990.

12. Tap fees in District 1 currently are set at $9,777. There were 48 housing starts in District 1 in 1989, and an additional 28 starts from January 1, 1990 through March 28, 1990. Some taps previously have been paid for by the developers, so that only some of the housing starts generate current tap fee revenue.

13. There was conflicting testimony regarding the obligations of MDC Land Corporation ("MDC") to District 1 under a tap purchase agreement. Mr. Kitchen's witness, Saranne Maxwell, Director of Municipal Research for Boettcher and Company, testified that she had analyzed District 4's financial affairs in March 1989 and had concluded that MDC owed District 1 approximately 2,700,000. Gene Myers, President of both District 1 and District 4, testified that the MDC tap purchase obligation was approximately $2,000,000. The witnesses agreed that amounts received by District 1 from MDC would be paid in turn to District 4 pursuant to the intergovernmental financing agreement between those districts. However, Mr. Myers testified that District 1 had sued MDC to collect the obligation, that MDC had countersued, and the prospects for collecting the obligation were uncertain.

14. Mr. Myers stated that the Town of Castle Rock owes payments of approximately $800,000 to District 4 for facilities and capacity constructed by District 4. Mr. Myers was unable to confirm whether these funds were pledged to District 4's bondholders. There was no testimony about when such payments might be made to District 4.

15. District 4's scheduled payments to bondholders in 1990 total approximately $3,572,732, with payments due on June 1, 1990 and December 1, 1990.

16. District 4 made extensive efforts in 1989 to arrange a refunding of its bond debt. At a February 21, 1989 meeting of District 4's board, the board discussed the potential shortfall in meeting the scheduled payments on District 4's bonds, and decided to schedule meetings with Chemical Bank, the underwriter on the Series A, B and C bonds, and Boettcher and Company, the underwriter on the Series D bonds. Meetings between District 4's board and Chemical and Boettcher representatives were held in March 1989. Chemical and Boettcher both recommended that District 4 pursue a restructuring of its scheduled bond payments. District 4's board then prepared a financial model for a bond refunding and a proposed work out schedule. In July and August 1989, representatives of District 4 met with representatives of Boettcher and with the Kemper Group, whose affiliates hold District 4's Series A and Series B bonds (for convenience, these bondholders are referred to herein as "Kemper"). At that time financial plans for the refunding and a schedule of events to occur for a tender of new debt instruments were discussed. In September 1989, District 4 representatives met with representatives of the Series C institutional bondholders and with representatives of Boettcher and Chemical Bank to review the financial plans for the restructuring and the schedule of events for the tender offer. District 4 then selected bond counsel to assist in the bond refunding. Another meeting with Kemper was held in October 1989. However, Kemper then announced a change in position and stated its opposition to the tender solicitation. A further meeting was held with Kemper in November 1989, at which time Kemper reaffirmed its position that the tender proposal was unacceptable and that it would be best for all concerned that District 4 file a Chapter 9 petition.

17. After reaching an impasse with Kemper, the holder of approximately one-third of District 4's bonds, District 4's board authorized the retention of bankruptcy counsel and the filing of a Chapter 9 petition.

18. Mr. Myers testified that Series D bondholders were not invited to directly participate in the negotiations summarized above. However, the apparent word in financial circles was that the District was in trouble, because Mr. Myers spoke to various Series D bondholders who telephoned to inquire about perceived financial problems of the District. Mr. Kitchen was one of those who inquired. Mr. Myers testified that he believed that it was impossible to directly involve the hundreds of Series D bondholders in the preliminary discussions regarding a bond refunding. However, it was contemplated that these preliminary discussions would lead to the preparation of a formal tender offer involving a written offering statement, which would be transmitted to all Series D bondholders. In the meantime, Boettcher, as the underwriter of the Series D bonds, assisted District 4 in developing a restructuring plan and offered to assist in communicating with Series D bondholders when an offering statement was transmitted.

19. The objective of the bond refunding was an exchange of existing bonds for new instruments with more lenient payment terms. There is no provision in the existing bond agreements which would permit any majority or super-majority of bondholders to bind dissenting bondholders to the terms of a tender offer. Mr. Myers considered a refunding to be feasible only if it would be accepted by all of the large institutional bondholders in Series A, B, and C and the overwhelming majority of the retail bondholders in Series D. The refunding under discussion contemplated 100% participation by all series of bondholders. One

issue never resolved in the conceptual discussions was how to deal with Series D bondholders who declined the tender offer.

### CONCLUSIONS OF LAW

1. Section 109(c) of the Bankruptcy Code specifies five requirements for Chapter 9 eligibility. Section 301 provides that a Chapter 9 case is commenced by the filing of a Chapter 9 petition by an entity that may be a debtor under Chapter 9. Section 921(c) permits the Court to dismiss a Chapter 9 petition if the debtor did not file the petition in good faith or if the debtor's petition does not meet the requirements of the Bankruptcy Code.

2. In the Chapter 11 context, "good faith" has been described as a requirement which "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." *Matter of Little Creek Development Co.,* 779 F.2d 1068, 1072 (5th Cir.1986). Determining whether a petition has been filed in good faith requires an evaluation of a debtor's "financial condition, motives, and the local financial realities." *Id.* These comments would appear to be equally applicable, at least in part, to a Chapter 9 petition.

■ 3. The Court concludes that District 4's Chapter 9 Petition was filed in good faith. District 4 is financially distressed based on a lack of development in District 1 which would generate property taxes and development fees for payment of District 4's bonds. District 4 lacks the funds to satisfy its next scheduled payment to bondholders. District 4 has been attempting for some time to achieve a restructuring of its debt and filed its Chapter 9 Petition to help it achieve that restructuring. Continued development in District 1, while behind original projections, suggests that the tax base may be enhanced and that further development fees may be realized, which might well permit the repayment of the bondholders pursuant to a feasible debt adjustment plan. All of this indicates that District 4 is using Chapter 9 for legitimate reasons and is not merely attempting to delay bondholders. The Court further notes that although District 4 has not yet defaulted on any of its required bond payments, such a default is imminent. The Court finds that District 4 is not acting irresponsibly by seeking to resolve this situation before it actually defaults on bond payments. This Court will not punish this conduct by finding that the Chapter 9 filing before default in bond payments is in bad faith.

4. With respect to the requirements of 11 U.S.C. § 109(c)(1) and (4), the Court concludes that District 4 is a municipality and that it desires to effect a plan to adjust its debts. These requirements were not contested by any of the Objectors.

5. The issues which have been raised by the Objectors principally involve whether District 4 is authorized under state law to be a Chapter 9 debtor, as required by 11 U.S.C. § 109(c)(2); whether District 4 is insolvent, as required by 11 U.S.C. § 109(c)(3); and whether District 4 has satisfied the requirements for pre-petition negotiations set forth in 11 U.S.C. § 109(c)(5). The Court's conclusions with respect to each of these requirements is set forth below.

### State Law Authorization

6. Mr. Kitchen and District 4 are in agreement that the threshold issue regarding this Chapter 9 filing is whether District 4 is authorized under Colorado law to be a Chapter 9 debtor. Briefs on this issue have been filed by District 4, Mr. Kitchen, and Kemper. The parties agree that the Colorado Revised Statutes contain neither an express authorization nor an express prohibition regarding Chapter 9 filings. District 4 and Kemper both argue that express, specific statutory authorization is not required and that there is sufficient general authority under Colorado law to support District 4's Chapter 9 filing. This Court agrees.

■ 7. Section 109(c)(2) of the Bankruptcy Code requires that a debtor be generally authorized by state law to be a debtor under Chapter 9. This provision of the

Bankruptcy Code is a restatement of a provision of Chapter IX of the Bankruptcy Act which was first enacted in 1976. The requirement of general authorization represented a compromise between the House, which would have permitted Chapter 9 filings if "not prohibited" by state law, and the Senate, which would have required Chapter 9 filings to be "specifically authorized" by state law. *See, 4 Collier on Bankruptcy,* ¶ 900.03, n. 9 (15th Ed.1990), *citing* H.R. 10624, 94th Cong., 1st Sess. (1975). Under this legislative compromise, general authorization would thus appear to require something more than the mere absence of an express state prohibition, but something less than specific state authorization.

8. Although there is little case law precedent or guidance, most courts which have considered the requirements of 11 U.S.C. § 109(c)(2) have concluded that specific or express state law authorization is *not* required. Instead, it is sufficient if a debtor has general powers which are consistent with seeking Chapter 9 relief. *See, In re Pleasant View Utility District of Cheatham County,* 24 B.R. 632 (Bankr. M.D.Tenn.1982), *aff'd* 27 B.R. 552 (D.Ct. M.D.Tenn.1982) (state grant of all powers "necessary, proper or convenient" to exercise of other municipal powers was sufficient); *In re City of Wellston,* 43 B.R. 348 (Bankr.E.D.Mo.1984) (grant of powers to act for preservation of peace and good order and for the benefit of trade and commerce was sufficient); and *In re Greene County Hospital,* 59 B.R. 388 (S.D.Miss. 1986) (grant of power to borrow money, enter into contracts, sue and be sued, and sell chattel property was sufficient). There is one contrary decision, in which a bankruptcy court found general authorization but was reversed without comment by the district court. *North and South Shenango Joint Municipal Authority,* 14 B.R. 414 (Bankr.W.D.Penn.1981), *rev'd* 80 B.R. 57 (D.Ct.W.D.Penn.1982).

9. District 4 has been granted very broad general powers under Colorado law. Under C.R.S. § 32-1-1001, District 4 has the power, among other things, to (i) be a party to suits, actions, and proceedings; (ii) borrow money, incur indebtedness, and issue bonds; (iii) refund any bond indebtedness; (iv) manage, control, and supervise all of the business and affairs of the district; and (v) exercise all rights and powers "necessary or incidental to or implied from the special powers" granted by the statute. Significantly, the statute states that the specific powers granted by the statute "shall not be considered as a limitation upon any power necessary or appropriate to carry out the purposes and intent" of Article 1 of Title 32, under which District 4 is organized.

■ 10. The Court concludes that express and specific authorization to file Chapter 9 is not required by 11 U.S.C. § 109(c)(2), and that the broad general powers set forth in C.R.S. § 32-1-1001 are sufficient to constitute general authorization for a Chapter 9 filing. This is in fact an action or proceeding which is "necessary or incidental" to the refund of bond indebtedness. The proceeding also is "necessary or incidental" to District 4's management, control and supervision of its business and affairs. The powers set forth in C.R.S. § 32-1-1001 relate more specifically to the purposes of a Chapter 9 case than the general powers relied upon in three of the cases cited above, which nonetheless found sufficient general authorization for a Chapter 9 filing.

11. Notwithstanding the broad grant of general powers to Colorado special districts, Mr. Kitchen suggests that the Colorado legislature has in fact intended to prohibit Chapter 9 filings by special districts. This conclusion is implied from two circumstances. First, Colorado drainage districts, unlike special districts, have been specifically authorized to seek bankruptcy relief since 1939. C.R.S. § 37-32-101 *et seq.* Mr. Kitchen argues that the absence of similar *specific* authorization for special districts creates the negative presumption that no *general* authorization exists for special districts. District 4 argues that drainage districts are organized under a different title than special districts, that the general powers granted to drainage districts are much narrower than those

granted to special districts, and that when the 1939 statute was enacted federal law required Chapter IX debtors to be "authorized by law" rather than "generally authorized." The "authorized by law" standard has been characterized as a stricter standard than the "generally authorized" standard enacted in 1976. *Pleasant View Utility District, supra* 24 B.R. at 636 and 637. The second circumstance from which Mr. Kitchen implies a legislative prohibition involves a statute enacted by the Colorado legislature in 1976. The statute, former C.R.S. § 32-1-1003, specifically authorized insolvent water, sanitation, and metropolitan districts to seek bankruptcy relief. Pursuant to the original 1976 enactment, this legislation sunsetted in 1979. District 4's brief appends correspondence from the state archives related to the 1976 legislation. That correspondence pre-dates the enactment of the "generally authorized" standard by Congress on April 8, 1976. The correspondence states that "[t]here is conflicting case law around the country in connection with whether specific statutory authorization is necessary in order for the Bankruptcy Court to obtain jurisdiction for such a filing by a municipality." District 4 suggests that the 1976 statute merely facilitated bankruptcy filings by several distressed districts who were then in need of Chapter 9 relief, by eliminating a split of judicial authority. District 4 argues that it is speculative to conclude that the 1979 sunset of specific authority evidences a legislative intention to deny general authorization for Chapter 9 filings after that date.

■ 12. With respect to the specific authorization to seek bankruptcy relief granted to Colorado drainage districts, Mr. Kitchen invokes a rule of statutory construction, *"expressio unius est exclusio alterius."* In other words, the express mention of bankruptcy availability for one type of governmental unit implies that bankruptcy relief is unavailable to all other types of governmental units. However, it has been noted that "[t]he maxim *expressio unius est exclusio alterius* is not of universal application in the construction of statutes. The legislative intention is to be taken according to the necessity of the

matter, and according to that which is consonant to reason and sound discretion." *Town of Trinidad v. Simpson,* 5 Colo. 65, 66 (Colo.1879); *People v. Gibson,* 53 Colo. 231, 125 P. 531, 536 (Colo.1912). It is not so clear that a grant of bankruptcy authorization to drainage districts in 1939, when a different federal standard applied, is meant to prohibit Chapter 9 filings by special districts which were organized under a different title enacted in 1981, and which were granted different general powers than were granted to drainage districts.

■ 13. To the extent that Mr. Kitchen argues that the issue can be resolved through the use of rules of statutory construction, it should be noted that there are a number of rules of construction that do not favor his position. For example, the Colorado legislature is presumed to have knowledge of existing laws at the time it enacts a statute. *City and County of Denver v. Rinker,* 148 Colo. 441, 366 P.2d 548, 550 (Colo.1961); *Meyer v. Charnes,* 705 P.2d 979, 982 (Colo.App.1985). In 1981, when the legislature enacted the present C.R.S. § 32-1-1001 granting broad general powers to special districts, federal bankruptcy law required general, *i.e.,* non-specific, authorization to file a Chapter 9 case. If the legislature is presumed to understand existing federal law, it is reasonable to presume that the legislature intended to permit Chapter 9 filings when it granted special districts all powers necessary to or implied from the powers to file proceedings and refund bond indebtedness. Another accepted rule of construction is that to the extent two state statutes are inconsistent, the one enacted later in time prevails to the extent of the inconsistency. *Public Emp. Retirement Ass'n v. Greene,* 195 Colo. 575, 580 P.2d 385, 387 (1978); *Public Emp. Retirement Ass'n v. Nichols,* 200 Colo. 328, 615 P.2d 657, 658 (1980). Thus, even if express Chapter 9 authorization sunsetted in 1979, the 1981 enactment of broad general powers sufficient to encompass a Chapter 9 filing would prevail in any event. And the most basic rule of construction is that "Courts should confine themselves to the construction of a statute as it is written

and not attempt to supply omissions or otherwise amend or change the law under the guise of construction." *Christner v. Poudre Valley Cooperative Ass'n*, 235 F.2d 946, 950 (10th Cir.1956). Mr. Kitchen would have the Court conclude that District 4 may not file a proceeding to refund bond indebtedness, in spite of the broad express and implied general powers granted to special districts by C.R.S. § 32–1–1001. Clearly, the Colorado legislature has the power to provide that a special district's general power to file proceedings under Section 32–1–1001 does not include Chapter 9 proceedings, or that the general power to refund bond indebtedness may only occur outside of Chapter 9. But in the absence of a clear expression of such legislative intent, this Court will not read such exceptions into that statute.

### Insolvency Requirement

14. Section 109(c)(3) of the Bankruptcy Code requires that District 4 be insolvent. "Insolvent" is defined in 11 U.S.C. § 101(31). For most bankruptcy purposes, insolvency is a balance sheet test. However, for Chapter 9 purpose insolvency is not a balance sheet test, but instead is a question of whether the debtor is unable to pay its debts as they come due.

15. While the existence of District 1's claims against MDC and payments due to District 4 from the Town of Castle Rock might be material elements of District 4's balance sheet, they are not dispositive on the insolvency issue. The issue is whether District 4 is able to pay its debts as they come due. District 1 has sued MDC for sums which District 1 contends are owed pursuant to a tap purchase agreement, but MDC has counter-sued. Mr. Myers testified that a $1,750,000 bond payment is due on June 1, 1990, and that District 4 lacks the funds to make the payment. The bondholders' remaining interest reserve and the cash on hand of District 1 and District 4 total far less than what is required for the next bond payment. There is no evidence that payments from the Town of Castle Rock are pledged to the bondholders or that such payments will be received in time for the next bond payment. Even in the light most favorable to the Objectors, the payment from the Town of Castle Rock, when combined with existing cash reserves, is much less than the June 1 bond payment. In short, there is nothing in the record which contradicts Mr. Myers' statement that District 4 is unable to pay its next scheduled bond payment. The Court concludes that District 4 is unable to pay its debts as they come due. Under the standard for insolvency applicable to Chapter 9 cases, District 4 is insolvent.

16. Although a dramatically increased mill levy on District 1 property would allow owners, theoretically, to produce the revenues required to meet District 4's current financial obligations, the Court does not believe that such a levy would eliminate, or sufficiently alleviate, District 4's insolvency. Given the evidence, it is highly doubtful that the taxes which would be required from District 1 property owners could be collected. The required level of taxation would certainly discourage new home construction, thereby eliminating tap fee income and preventing a broadening of the tax base. Moreover, if unpaid taxes are enforced through tap sales, purchasers will be difficult to find since an excessive mill levy would make the homes uneconomic. Land is removed from the tax rolls if no bid is received at tax sale. C.R.S. § 39–11–108. The mill levy on any property remaining on the tax rolls then must be increased still further in order to maintain the same theoretical level of revenue. Kemper's brief aptly describes this cycle as a "death spiral."

### Negotiation Requirement

17. Section 109(c)(5) of the Bankruptcy Code sets forth requirements with respect to pre-petition negotiations with creditors. The Objectors argue that District 4 has failed to satisfy these requirements, since District 4 never directly included Series D bondholders in negotiations or went forward with a formal tender solicitation following the statement by the Series A and B bondholder that it opposed the solicitation. Section 109(c)(5) is satisfied if

a debtor has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding a majority in amount of claims of each class that the debtor intends to impair under a debt adjustment plan. District 4 argues that it has satisfied that requirement because it negotiated with the Series A and Series B bondholder and failed to obtain the agreement of 100% of the claims in those "classes." Mr. Kitchen argues that all four series of bondholders should be viewed as a single class, since no series has priority over any other series. With Series A and B bonds constituting about one-third of the total debt, Mr. Kitchen argues that less than a majority of the claims of the class failed to agree to the proposed tender at the conceptual stage; Series C indicated support at the conceptual stage and Series D was never consulted. However, Mr. Kitchen, a Series D bondholder, also argued that the interests of the "institutional" bondholders in Series A, B and C are very different than the interests of the "retail" bondholders in Series D. Since, under 11 U.S.C. § 1122(a), the guideline for classification of claims is whether a claim is substantial similar to the other claims in the same class, it is not unreasonable to conclude that separate classes are appropriate, at least between Series A, B and C on the one hand and Series D on the other. Under this analysis, the Series A and B bondholders are at least a majority of a class, and the Section 109(c)(5) alternative is satisfied.

█ 18. Even if the Court were to adopt Mr. Kitchen's argument that all bondholders should be viewed as a single class, District 4 satisfies the requirements of 11 U.S.C. § 109(c)(5) if District 4 were unable to negotiate with creditors because such negotiation was impracticable. On this point, the evidence is uncontradicted. The feasibility of District 4's tender offer was premised on unanimous or near-unanimous approval by all series of bondholders. Ms. Maxwell testified that if a large amount of existing bonds were not tendered, the financial model on which the bond refunding was premised would be destroyed. There were no provisions under the existing bond documents permitting a majority of bondholders to bind a dissenting minority to the proposed tender. When the Series A and B bondholder, holding one-third of the total debt, had already stated its opposition to the proposed tender, this likely would have been required to be included in the offering statement describing the tender offer. Ms. Maxwell stated that to proceed with the tender in this circumstance was "impossible." Mr. Myers testified that to go forward with the tender offer in this circumstance would have been expensive, time-consuming, and futile.

19. The Court does not view lightly the negotiation requirements of 11 U.S.C. § 109(c)(5). However, the Court concludes that District 4 did not view these requirements lightly either. District 4 had numerous meetings with institutional bondholders and the bond underwriters, to develop a financial model for a bond refunding and to reach a conceptual agreement with the largest bondholders that would have led to a tender solicitation. It certainly was impracticable for District 4 to have included several hundred Series D bondholders in these conceptual discussions. Had a conceptual agreement been reached, Mr. Myers testified that District 4 would have prepared an offering statement and other bond documents and solicited a tender from all bondholders, including Series D bondholders. But six months of conceptual discussions led to an impasse with the holder of one-third of the bond debt. The Court concludes that to go forward with the tender solicitation was impracticable within the meaning of Section 109(c)(5)(C).

20. Although District 4 did not negotiate with the Series D bondholders, it did negotiate with the Series A, B and C bondholders, and those bondholders hold a majority in amount of the claims. It may have not been courteous, good form or good practice, or even good business judgment, to not integrate the Series D bondholders into the negotiation process. Nonetheless, the technical and practical requirements of Section 109(c)(5)(B) have

been met and, therefore, the requirement of Section 109(c)(5) has been satisfied.

21. Based on the foregoing, the Court concludes that District 4 satisfies the eligibility requirements of 11 U.S.C. § 109(c). The Court further concludes that District 4 filed its petition in good faith and that the petition meets the requirements of Title 11. Accordingly, the Court denies the objections to District 4's Chapter 9 Petition. An Order for Relief under Chapter 9 shall enter pursuant to 11 U.S.C. § 921(d).

IT IS THEREFORE ORDERED that, pursuant to 11 U.S.C. § 921(d), the objections to District 4's Chapter 9 Petition are DENIED and an Order for Relief Under Chapter 9 shall and hereby is entered.