In re **SULLIVAN COUNTY REGIONAL REFUSE DISPOSAL DISTRICT,** Debtor.

In re **SOUTHERN WINDSOR/WINDHAM COUNTIES SOLID WASTE MANAGEMENT DISTRICT,** Debtor.

**Bankruptcy Nos. 93–12640–JEY, 93–12639.**

United States Bankruptcy Court, D. New Hampshire.

Feb. 24, 1994.

Harold T. Judd, Asst. Atty. Gen., Concord, NH, for State of N.H.

Frank Spinella Jr., Hibbard & Spinella, Concord, NH, for Mirra Co., Inc.

Jeffrey L. Jonas, Boston, MA, for Brown, Rudnick, Freed & Gesmer.

William S. Gannon, Wadleigh, Starr Offices, Manchester, NH, Diane M. Puckhaber, Rogers & Puckhaber, Concord, NH, of City of Claremont.

Joseph D. Leverone, Manchester, NH, for Hargo Industries.

David Kibbey, Newport, NH, Business and Industries, Kenneth A. Colburn, Concord, NH, for interested parties.

David A. Sears, Peabody & Brown, Manchester, NH, for debtor.

Robert A. Olson, Brown, Olson & Wilson, Concord, NH, for Sullivan County Regional Refuse Disposal.

John M. Sullivan, Sulloway, Hollis & Soden, Concord, NH, Christopher T. Katucki, Goodwin, Proctor & Hoar, Boston, MA, for Wheelabrator Claremont Co., L.P.

Jess T. Schwidde, Glinka & Schwidde, Rutland, VT, Bruce A. Harwood, Sheehan, Phinney, Bass & Green, Manchester, NH, for Town of Ludlow, Vt.

Frederick Coolbroth, Devine, Millimet & Branch, Manchester, NH, for Calvert Tax-Free Reserves Vt. Portfolio.

### MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

### Introduction

This case presents the Court with a series of complex questions regarding whether the above-named municipal debtors should be permitted to remain in the bankruptcy court under their chapter 9 petitions. The record establishes that the debtors did not exercise pre-bankruptcy their assessment powers to require their member municipalities to contribute, through tax levies or otherwise, sufficient monies to meet a burgeoning debt of some $1,133,442.61 as of the filing date in unpaid service fees for usage of an incinerator facility. The incinerator was constructed by a private party under a joint venture agreement between the debtors and the facility operator.

Those central facts are at the heart of a number of the issues raised by the objecting parties to these chapter 9 petitions. This case involves a manifestation of the recent trend to "privatization" joint venture agreements between municipalities and private parties willing to provide capital improvements that would otherwise require taxation or direct bonded indebtedness by the municipalities. As such, it raises significant questions with regard to the appropriate treatment of the financial obligations involved when disputes arise between the parties— including when resort to chapter 9 relief under the federal Bankruptcy Code is warranted and permissible in such situations.

On September 16, 1993, the Sullivan County Regional Refuse Disposal District and the Southern Windsor/Windsor Counties Solid Waste Management District each filed a chapter 9 petition with this Court. The Sullivan County Regional Refuse Disposal District and the Southern Windsor/Windham Counties Solid Waste Management District are each solid waste disposal Districts formed pursuant to the requirements of the New Hampshire Waste Management Act and the Vermont Solid Waste Disposal Act respectively.[1]

The Sullivan County District consists of 15 towns and cities in New Hampshire as member municipalities.[2] The Windsor Counties

---

**1.** Under the federal Solid Waste Disposal Act, each state is required to develop and implement a solid waste management plan which meets minimum federal guidelines for disposal and storage of solid waste. Solid Waste Disposal Act, 42 U.S.C. § 6942 (1982 & Supp.1993). Pursuant to this mandate, Vermont passed the Waste Management Act, Vt.Stat.Ann., tit. 10 ch. 159 (1992) and New Hampshire passed the Solid Waste Management Act, N.H.Rev.Stat.Ann. § 149–M (1991 & Supp.1992). To further promote economies of scale the Vermont debtor and the New Hampshire debtor entered into a cooperative agreement for the disposal of solid wastes from all the towns in each respective district. Interstate Solid Waste Compact, N.H.Rev.St.Ann. § 53–D (1991 & Supp.1992); Interstate Waste Compact, Vt.Stat.Ann. tit. 10 ch. 46 (1992); ap-

proved by Congressional Act of Oct. 4, 1982, 96 Stat. 1207 (1982). The "cooperative agreement" between the Vermont Debtor and the New Hampshire Debtor operates under the trade name, the New Hampshire/Vermont Solid Waste Project (hereinafter the "Project"). The "Project" has not filed petition for bankruptcy relief. Rather, each of the two districts which form the Project filed separate petitions for relief.

**2.** The fifteen New Hampshire communities which comprise the Sullivan County Regional Refuse Disposal District are Acworth, Center Harbor, Claremont, Cornish, Croydon, Goshen, Grantham, Langdon, Lempster, Meredith, New London, Newport, Plainfield, Springfield and Sunapee.

District consists of 14 Vermont towns and cities as member municipalities.[3] The case was filed in New Hampshire since the Districts' financial problems relate to a "waste-to-energy" incineration plant constructed in Claremont, New Hampshire, under a joint venture contract between the Districts and a predecessor company to the present plant owner and operator, Wheelabrator Claremont Co., L.P. (hereinafter referred to as "Wheelabrator").

The two districts operate collectively pursuant to the NH/VT Solid Waste Cooperative Agreement under the trade name of the "New Hampshire/Vermont Solid Waste Project" which has been generally referred to as the "Project" by the parties both inside and outside this Court proceeding.[4] The "Project" was organized in March of 1982 for the purpose of providing for the disposal of solid waste for the 29 communities making up the membership of the districts. The record is clear that the "Project" is not a separate legal entity although "it" apparently hires employees, maintains bank accounts, and issues correspondence and financial reports in its own name. This Court will eschew reference to a nonentity—whether named or not—and will deal with the District entities as the debtors actually before it.

As of the date of the filing of the chapter 9 petitions on September 16, 1993 the schedules indicate that the debtors have total liabilities of approximately $1,330,000 (excluding bonded indebtedness) comprised of the

service fee debt of $1,133,442.61 owing to Wheelabrator; secured claims of approximately $19,000; priority claims of approximately $3,000; and trade debt of approximately $175,000.[5]

At the date of filing the debtors had approximately $750,000 unencumbered cash on hand.[6] However, the debtors had coming due in December of 1993 a payment on outstanding bond indebtedness of approximately $800,000. The latter relates to the outstanding bonds in the principal amount of $2,450,000 held by the Calvert Funds. The total outstanding bonded indebtedness of the debtors' Districts at the date of filing was $4,950,000.

On September 22, 1993, Wheelabrator filed a "Motion to Dismiss and Objection to Entry of an Order for Relief." (see Court Doc. No. 6). On October 27, 1993 a bondholder's representative filed an "Objection by Calvert Funds to Chapter 9 Petitions."[7] (see Court Doc. No. 3). Also on October 27th, the State of New Hampshire filed an "Objection of State of New Hampshire to Chapter 9 Petitions" (see Court Doc. No. 40). Additionally, on November 5, 1993, the Business and Industry Association of New Hampshire filed a "Statement In Support of Motion to Dismiss and Objection to Entry of an Order for Relief" (see Court Doc. No. 53).

### I. FACTUAL BACKGROUND

As noted above, the two debtors involved in this case are solid waste districts orga-

---

3. The fourteen Vermont communities which comprise the Southern Windsor/Windham Counties Solid Waste Management District are Andover, Ascutney (Wethersfield), Baltimore, Brownsville (West Windsor), Cavendish, Chester, Grafton, Ludlow, Reading, Rockingham (Bartonsville, Bellows Falls, Cambridgeport, Saxtons River), Springfield, Westminster, Windsor and Plymouth.

4. NH/VT Solid Waste Project was formed in 1982 pursuant to the Interstate Solid Waste Compact, N.H.Rev.St.Ann. § 53–D (1991 & Supp.1992); and Interstate Waste Compact, Vt. Stat.Ann. tit. 10 ch. 46 (1992) and authorized by the Congressional Act of Oct. 4, 1982, 96 Stat. 1207 (1982) although not formally adopted by the Districts until May 16, 1989. (Exhibit 108).

5. The testimony at the hearings indicated that the actual trade debt probably is closer to $90,000.

6. Although the debtors had approximately $1 million in cash listed in schedules, testimony revealed that about $240,000 of that was restricted under applicable regulatory law to cover the future "capping" costs of an ash landfill.

7. This objection filed by Calvert Municipal Intermediate Fund ("Calvert Municipal") and Calvert Tax–Free Reserves Vermont Portfolio ("Calvert Vermont") is referred to jointly as the "Calvert Funds". These Funds are parties in interest since Calvert Municipal is the holder of a general obligation bond in the principal amount of $1,450,000 issued by the New Hampshire District on April 1, 1993, and Calvert Vermont is the holder of general obligation bond in the amount of $1,000,000 issued by the Vermont District on April 1, 1993.

nized under federal and state legislation encouraging municipalities to band together in such districts to take care of the pressing environmental problem of disposal of solid waste of the coalition. The objective is to act on a joint and unified basis to share costs and eliminate duplication of services on a hopefully more economic basis to meet the increasing challenge of the waste disposal problem. N.H.Rev.Stat.Ann. § 53–D (1991); Vt.Stat. Ann. tit. 10, § 1201, et seq. (1992).

The New Hampshire District, the Sullivan County Regional Refuse Disposal District, was organized by a creation document executed on December 17, 1981 (see Exhibit 107). The Vermont District, Southern Windsor/Windham Counties Solid Waste Management District, was organized by a creation document executed on December 16, 1981 (see Exhibit 107(a)).

On April 12, 1985 the two Districts acting as the NH/VT Project entered into a "Waste Disposal Agreement" between themselves and NH/VT Energy Recovery Corporation, a New Hampshire Corporation, which among other things provided for the designing and building of a "waste-to-energy" incinerator facility to provide for disposal of solid waste from the member municipalities in addition to their landfill operations. (See Court Doc. No. 31).

On July 1, 1985 the parties executed an amendment to the Waste Disposal Agreement under which the original corporate party was replaced by SES Claremont Company LP (see Court Doc. No. 31) and a further separate Amendment on July 1, 1985 making various miscellaneous changes to the substantive terms of the original agreement (see Court Doc. No. 31). Subsequent to 1985, and prior to the commencement of the chapter 9 proceedings in this Court, the position of SES Claremont Company LP under the Waste Disposal Agreement was taken over by Wheelabrator, one of the parties moving for dismissal of these chapter 9 proceedings.

Under the terms of the Waste Disposal Agreement the Districts were required, through their member towns and cities and otherwise, to deliver a guaranteed annual tonnage (GAT) of solid waste for the incinerator facility each year and to pay a service fee for the use and reservation of the capacity of the facility. (See Court Doc. No. 31; Waste Disposal Agreement ¶ 6.2). The Agreement provides for collection of "service fees" for the use of the incinerator at stipulated rates. (See Court Doc. No. 31, Waste Disposal Agreement, ¶ 6.4). The Agreement further provides in paragraph 6.7(b) an absolute obligation to pay these fees for the minimum tons stipulated or actual tons delivered, if greater, as follows:

> The Districts acknowledge and agree that their obligation to pay all amounts payable to the Company, or on behalf of the Company to the Trustee, pursuant to the terms of this Agreement shall be absolute and unconditional under any and all circumstances, shall not be subject to any counterclaim, setoff, deduction, abatement or defense based upon any claim the Districts may have against the Company and shall remain in full force and effect without regard to, and shall not be released, discharged or in any way affected by, any circumstance or condition (whether or not the Districts shall have knowledge or notice thereof).

(See Court Doc. No. 31, Waste Disposal Agreement ¶ 6.7).

The original agreements between the Districts and the member municipalities empower the Districts to assess the member municipalities for any shortfall in meeting their operational liabilities if the Districts' revenues are otherwise insufficient.[8] The stipulated procedure was a two-stage process in which the "joint meeting" of the Districts would first address the question of a cash shortfall and, if appropriate, recommend assessment which each District in effect had to separately approve.[9] As will be developed

---

8. Exhibit 107, NH District Agreement, Art. IV ¶ 2; Exhibit 107–A, VT District Agreement Art. IV, ¶ 2; incorporated into Waste Disposal Agreement ¶ 12.2 (Court Doc. No. 31).

9. ARTICLE XIII of the "NH/VT Solid Waste Project Cooperative Agreement" (Exhibit 108) states:
 Assessments may be deemed necessary to rectify a deficit situation or to address an unexpected and/or unusual situation(s) that may occur throughout the budget year. After a

later, this procedure in effect evolved into a "two-step sidestep" thwarting any resort to the assessment power.

Notwithstanding these provisions and powers to assess, the Districts elected to deal with their developing financial shortfall in meeting the obligations to Wheelabrator by increasing tipping fees by an amount they believed would be sufficient to cover the gap between revenues that would be produced at the minimum guaranteed annual tonnage and revenues that actually were produced at the lower tonnage brought to the incinerator in a particular year.[10] In other words, the Districts simply budgeted each year based on the results of the prior year assuming a like shortfall would occur and increased the tipping fees accordingly.[11]

This approach worked for a while but eventually the tipping fees became so high that any further increase would be counterproductive, i.e., the "death spiral" would occur whereby increased fees result in lower total dollar collections by driving away customers because of the higher fees.[12] Eventually the tipping fees at the Claremont New Hampshire incinerator facility operated by Wheelabrator rose to a level among the highest in the country.

The evidence received at the dismissal hearings established that the required minimum tonnage in the relevant recent years was 47,500 tons whereas the Districts were only producing approximately 42,000 tons per year. Accordingly, the essential reason that the Districts are in this Court stems from the fact that in recent years they have been producing below their guaranteed amount of waste for the incinerator creating a shortfall in payments guaranteed to Wheelabrator under the Waste Disposal Agreement caused by the difference between the actual payments in tipping fees and the minimum payments guaranteed in the contract.

Although the Districts had the power to assess the member towns and cities, which would have forced those entities to either increase their tax revenues accordingly, or arrange appropriate borrowing if they had no other surplus cash available to meet the assessments, the record is clear that the Districts never attempted to exercise their assessment power to meet the shortfall and payment of service fees to Wheelabrator until one day before the filing of these chapter 9 petitions at a September 15, 1993 meeting. At that point, the municipalities, acting through their designated representatives, on the joint committee that governed the Districts involvement with the Wheelabrator facility, voted against proceeding with an assessment. The Districts then separately also voted by their member representatives against an assessment.[13]

Following the commencement of the chapter 9 proceedings in this Court, and during the series of hearings on the dismissal mo-

complete review and determination of any potential assessment situation by the executive committee, a full report will be made immediately to the Joint Meeting. The report will be accompanied with a recommendation of the executive committee as to how the assessment will be retrieved. The Joint Meeting will make the final determination as to how the revenue for the assessment will be raised and recommend a collection procedure for each District to follow. The Districts will then meet individually to address the assessment issue.

**10.** A "tipping fee" is the per ton charge to a party, whether municipal or private, who is delivering solid waste to the incinerator for disposal.

**11.** The testimony and the record is quite confusing as to the procedures employed by the Districts in this regard. See Transcript of testimony of Judy Haber and Joseph Fromberger, November 8, 1993. The Districts apparently handled the problem differently with different member

municipalities. However, the record is clear that in any event the Districts early on abandoned any attempt to follow the "upfront" assessment procedure contemplated under the various contractual provisions and switched to a "reactive" system tied to the actual usage of the incinerator coming from all sources within the membered municipalities. Whether this system is denominated "tipping fees" or "user fees" or some other rubric the gist of the situation I believe is as stated in the text.

**12.** This Court has previously encountered the dreaded "death spiral" in an electric utility reorganization. See *In re PSNH*, 114 B.R. 820, 831 (Bkrtcy.D.N.H.1990).

**13.** This reminds the Court of the old saw about the two tax payers who amicably agreed: "Don't tax you—Don't tax me—Tax the guy behind the tree!"

tions, the debtors indicated they would, and subsequently did, file a "Statement of Undisputed Indebtedness" on November 24, 1993 [14] whereby the debtors agreed that they were indebted to Wheelabrator on an undisputed obligation relating to the unpaid service fees from the beginning of 1993 through the September filing date in the amount of $1,133,442.61. [Annex 1 to this Opinion]. On January 6, 1994,[15] the debtors amended their schedule F to indicate this debt as an undisputed unsecured claim. [Annex 2 to this Opinion]. The "NH/VT Solid Waste Management Project" during the course of the dismissal hearings submitted an unsigned "Draft Plan of Adjustment" dated November 12, 1993 [16] which indicates that "Project Management" would propose, if the debtors are permitted to remain in this Court, to go forward with a plan which would require assessments against the member municipalities. [Annex 3 to this Opinion—not including projections]. The proposal would not attempt to reject the Wheelabrator contract but rather to provide for a payout of the unpaid service fees over a period ending in December, 1995.[17]

## II. DEBT AND NEGOTIATIONS

It is necessary to now turn to an examination in some detail as to how the problem of unpaid service fees totalling some $1,133,-442.61 developed and how the Districts responded to the growing problem of these unpaid fees. This problem however did not develop overnight. As the record reflects, as early as August of 1991 Wheelabrator advised the Districts that they were in default under the Waste Disposal Agreement because of their failure to pay some $65,435 of overdue service fees. The amount in default increased to $80,441 as of April 1992; $495,-468 as of June of 1992; $587,805 in July of 1992; $965,631 as of April 1993; $1,052,497 as of June 18, 1993; and well over $1,000,000 as of July of 1993. Through correspondence beginning at least from June of 1992, Wheelabrator gave the Districts continuing notices of default and requests for action with little response.[18]

Without going into all the details of this correspondence it is sufficient to note that Wheelabrator gave clear and repeated notices of the increasing defaults. They asked that they be advised "what actions the Districts are taking to resolve the same" [19]; asked again what actions the Districts would take on the increased unpaid balance [20]; requested the Districts to come up with "a plan of action to resolve this situation" [21]; threatened to begin charging interest on the past due amounts in view of the fact that "Wheelabrator has repeatedly asked the Districts for a plan of action to resolve this problem, and repeatedly the Districts have chosen to ignore these requests" [22]; repeated and reaffirmed its prior firm position that it would not honor or discuss any request to offset other claimed obligations against the unpaid service fees; [23] noted that Wheelabrator "has repeatedly offered to work out a payment schedule, to no avail" [24]; and on July 9, 1993 with a certain note of exasperation Wheelabrator advised that after nearly two years of negotiations to resolve the issues stemming from the continuing defaults and the "futility of past negotiations with the Districts" Wheelabrator would consider pursuing various remedies available to it including "termination" or "litigation" as it might consider appropriate.[25]

Wheelabrator then made its determination as to further action in a letter of July 19,

---

14. See Court Doc. No. 71.

15. See Court Doc. No. 74.

16. See Court Doc. Nos. 64 and 66.

17. See Court Doc. No. 64.

18. See Exhibit Nos. 9, 10, 11, 12, 13, 14, 15, 16, and 17.

19. See Exhibit 11—August 22, 1991 letter.

20. See Exhibit 11—April 20, 1992 letter.

21. See Exhibit 10—June 18, 1992.

22. See Exhibit 11—July 23, 1992 letter.

23. See Exhibit 11—March 26, 1993 letter.

24. See Exhibit 11—April 29, 1993 letter.

25. See Exhibit 13—July 9, 1993 letter.

1993[26] giving the Districts a termination deadline as follows:

Pursuant to Sections 9.1, 9.3(a) and 9.4 of the April 12, 1985 Waste Disposal Agreement (the "Agreement"), as amended, between the Sullivan County Regional Refuse Disposal District and the Southern Windsor/Windham Counties Solid Waste Management District (the "District"), on one hand, and Wheelabrator Claremont Company, L.P. ("Wheelabrator Claremont"), as successor to the rights of NH/VT Energy Recovery Corporation under the Agreement, on the other, please be advised that, because of the District's failure to pay monies long over due and owing to Wheelabrator Claremont under the Agreement, not withstanding our repeated demands for payment, Wheelabrator Claremont will, after September 17, 1993 no longer accept waste from the District.

Please note that, as provided by the Agreement, Wheelabrator Claremont's exercise of its right to terminate its obligation to accept waste under the Agreement is in addition to and is not in substitution for other rights under the Agreement, including its right to recover such damages as Wheelabrator Claremont has or will incur hereafter, and shall not affect any liabilities now or hereafter accrued under the Agreement.

Until August of 1993, and before Wheelabrator's "termination" letter, the Districts' responses to Wheelabrator's continuing notices of default and demands were vague in specifics and generally argued that Wheelabrator owed certain monies under various collateral agreements that had to be resolved before the Districts would be in a position to negotiate a satisfactory resolution of the dispute. The Districts noted that their ability to make payments to Wheelabrator had been adversely affected by "Wheelabrator's failure to pay certain monies due the Districts" under various provisions of the waste disposal agreement apart from the service fee requirements.[27]

After receiving the July 19th termination letter, the Districts in a July 29, 1993 letter ultimately proposed a "Settlement Package" to Wheelabrator which would require Wheelabrator to agree to binding arbitration as to the collateral debt matters and stated that upon acceptance of that proposal the Districts would "initiate reasonable efforts to secure funds to pay the outstanding monthly service fees [for] January through April of 1993 . . . ."[28]

Wheelabrator responded to the Districts' July 29 proposal in a letter of August 3, 1993[29] which stated the following:

We are in receipt of your letter of July 29, 1993. We are also very much interested in an equitable and expeditious resolution of this situation.

Over the past year, Wheelabrator has gone beyond good-faith in exercising continued forbearance with regard to the Districts failure to pay amounts due under the Waste Disposal Agreement. Instead of acting in accordance with the terms of the Waste Disposal Agreement to pay amounts due, you unilaterally chose to withhold payment for disposal services, an option clearly not allowed under the Waste Disposal Agreement. Your proposal of July 29, 1993, provides no assurance as to how much or when we will be paid for services rendered.

Your letter does not constitute a good-faith proposal to pay what is owed, but is rather an unacceptable open-ended request for continued forbearance.

Unless we receive a proposal to pay amounts presently owed under an acceptable payment schedule, we reserve all rights under the Waste Disposal Agreement including but not limited to those indicated in our letter of July 19, 1993.

In response to the reaffirmation of the termination deadline of September 17th, by Wheelabrator in the foregoing letter, the Districts in a letter of August 20, 1993[30] responded as follows:

**26.** See Exhibit 14—July 19, 1993 letter.

**27.** See Exhibit 12—June 7, 1993 letter.

**28.** See Exhibit 15—July 29, 1993 letter.

**29.** See Exhibit 16—August 3, 1993 letter.

**30.** See Exhibit 9.

This letter responds to your letter of August 3rd complying with the demand in your correspondence for a payment schedule as a prior condition to binding arbitration. The Project commits to the following payment schedule on the assumption that Wheelabrator accepts the terms of our proposal.

Twelve monthly payments will be made to Wheelabrator in equal amounts beginning January 1994. These payments will be in addition to the 1994 monthly Service Fee payments and include the four outstanding monthly Service Fees (Jan.— April 1993) totaling approximately $830,-000.00 which is net of the 5 year True up amount. The payment of this amount is without prejudice to the Project's right to contest its accuracy in arbitration. The calculation of the True-up and the parties remaining contract claims would also be submitted to arbitration.

In order to secure the funds necessary to pay Wheelabrator the foregoing amounts the Project is doing the following:

1. A special Joint Meeting is being called to obtain approval for raising the necessary funds through an assessment on member towns and/or through a tipping fee increase. An initial proposal will be presented at the August 26, 1993 regularly scheduled Joint Meeting.

2. Negotiations with a secure financial institution have been initiated for interim financing in anticipation of an assessment on member towns. Interim financing would provide funds due Wheelabrator beginning in January of 1994 and conform to borrowing requirements of the Vermont and New Hampshire District Agreements.

I trust you will find this proposal removes all remaining obstacles to binding arbitration.

Wheelabrator responded to the District's letter of August 20th in a letter of their own of September 2, 1993 [31] which stated the following Wheelabrator position:

We are in receipt of your letter of August 20, 1993, which sets forth a proposal to pay amounts due Wheelabrator under Section 9.3(a) of the Waste Disposal Agreement. We have the following concerns with respect to your letter. First, the payment schedule is not supported by a demonstration of the Districts' ability to make payments when due. Although your letter lays out steps contemplated to be taken to obtain funds, it does not provide adequate assurance that the Districts will in fact have access to funds to make payments in accordance with the proposed schedule.

Second, you indicate the total amount owed to Wheelabrator (net of Operating and Maintenance Costs due under Schedule 9 Section 2.5 (i.e., "True-up Costs")) to be approximately $830,000.00. We have calculated the undisputed amount referenced in your letter to be approximately 985,279.-00. (See, attachment to this letter which is incorporated by reference herein).

Third, you propose that the parties arbitrate the calculation of True-up Costs as well as remaining contract claims. With respect to arbitration of True-up Costs, Wheelabrator would not be willing to commit to arbitrate total True-up Costs without first having the opportunity to consider which True-up Costs are actually disputed. We expect that such disputed costs would have already been identified in the course of contract administration by the Districts. Absent some specification from the Districts as to which True-up Costs are disputed, Wheelabrator will not consider consenting to binding arbitration under Section 14.6 of the Agreement.

Regarding your proposal to arbitrate "other contract claims"; because of our absolute rights to receive payment for services rendered without set-off as provided for under Section 6.7(b), Wheelabrator will not agree to arbitrate other contract claims at this time. Moreover, Wheelabrator expressly reserves its right to object to arbitration of any contract dispute, unless it is specifically designated as arbitrable under Section 14.6 of the Waste Disposal Agreement.

To resolve this matter to our satisfaction, agreement must be reached as to amounts

**31.** See Exhibit 17.

owed to Wheelabrator. Wheelabrator would then agree to a payment schedule whereby the Districts would in addition to making timely payments of amounts otherwise due under the Waste Disposal Agreement, pay one third of amounts in default plus interest owed by December 31, 1993 and pay the remaining two-thirds of the overdue amounts plus interest owed by June 30, 1994.

As of this date, Wheelabrator intends to exercise its rights as outlined in our letter of July 17, 1993, unless agreement is reached regarding an acceptable payment schedule by September 17, 1993.

On September 2, 1993 the Districts (acting jointly under the name "NH/VT Solid Waste Project") sent a letter [32] to their member municipalities reciting that a proposal was made at their last joint committee meeting in August to raise approximately $830,000 through "assessment or a tipping fee increase" should that action become necessary in the dispute with Wheelabrator. The letter advises the member municipalities that the dispute involves Wheelabrator's assertion that the Project owed it approximately $1.2 million whereas the Project considers that Wheelabrator has failed to pay its share of substantial obligations on other collateral provisions of the agreement. The letter notes that the Districts had sent the August 20, 1993 letter to Wheelabrator proposing the $830,000 monthly installment payments beginning in January 1994 and also proposed binding arbitration on the other disputed claims but that "Wheelabrator has not yet replied to these proposals."

The letter of September 2, 1993 to the member municipalities then noted that Wheelabrator had reaffirmed its September 17th termination deadline. The letter concluded as follows:

Under the terms of the contract, the Districts are required to pay Wheelabrator a service fee every month. This payment is "absolute and unconditional under any and all circumstances" according to the contract provisions. Therefore the Project cannot "set off" or deduct from the service fee amounts Wheelabrator may owe the Project.

The options left the Project are to raise the money necessary to satisfy Wheelabrator's claims through assessment or tipping fee increases and then engage in arbitration or litigation with Wheelabrator to recover funds due the Project.

And if we fail to pay Wheelabrator and they terminate the member towns, Wheelabrator can still collect most of the monthly service fee plus liquidated damages even though we may no longer be delivering trash to the facility. That's the language of the contract!

The recommendation therefore is to pay the four service fees through a tipping fee increase or assessment and then engage in arbitration or litigation to collect monies due the Districts.

Wheelabrator's letter of September 2, 1993 apparently had not been received by the Districts when the Districts' letter of the same date went out to the member municipalities. The record does not indicate any attempt by the Districts to advise the member municipalities of Wheelabrator's response, prior to the joint committee meeting on September 15, 1993, at which the joint committee took up the recommendations with regard to approval of a "tipping fee increase or assessment" as outlined in the September 2, 1993 letter from the Districts. The record also does not indicate any attempt by the Districts to ascertain Wheelabrator's position as to any extension of the September 17th deadline should the joint committee actually approve an assessment upon the member municipalities to make the payments to Wheelabrator at the September 15, 1993 meeting.[33]

---

32. See Exhibit 116.

33. The record includes some cryptic references to a September 13, 1993 proposal from Wheelabrator but neither party introduced any such proposal into the evidentiary record. Joseph Fromberger, who is the Chairman of the Joint Committee as well as the Chairman of the New Hampshire District, testified that he and Mr. Woodman, the Chairman of the Vermont District, met with Mr. Madigan, Vice President of Wheelabrator, a few days before the September 15th meeting of the Districts. (Transcript November 8, 1993, Transcripts folder, pp. 204–205,

The correspondence between Wheelabrator and the Districts has been set out in some detail inasmuch as it indicates that the Districts did not specifically broach the question of imposing assessments on the member municipalities until August 1993 and did not take up the question of *approving* such an assessment until the joint committee meeting in September of 1993.[34]

At the meeting of September 15, 1993 the actual motion presented to the joint committee was as follows:

> Be it resolved that in conformance to article XIII of the Cooperative Agreement (Assessments), the Joint Committee hereby directs the New Hampshire and Vermont Districts respectively to assess the member municipalities an amount not to exceed $830,000 for FY 94, proportioned according to tonnage delivered by each respective municipality to the Wheelabrator Claremont waste to energy plant during the calendar year 1993. An amount will be borrowed, not to exceed $830,000 against this anticipated assessment. The assessment is to occur only if the Project fails to raise the funds by other means or fails to obtain a credit from Wheelabrator before the end of 1993 on funds owed the Project.

This motion (see Exhibit No. 208) had attached a schedule of the pro rata amounts to be assessed against each member municipality to total the $830,000 figure. [Schedule of proposed assessments attached as Annex 4 to this opinion].

The recommendation to approve assessments was voted down by the joint committee acting as a whole and also by separate votes of the representatives coming from the member municipalities of the respective New Hampshire and Vermont Districts. Immediately thereafter, on an oral motion, and in secret session, the joint committee approved the filing of the chapter 9 petitions which were filed early on the next day. The record does not indicate that the member municipalities were given any notice, written or otherwise, prior to the September 15, 1993 meeting, that the question of possible chapter 9 authorization would be taken up at that meeting.[35] The record does affirmatively indicate that there was no discussion at the time the motion to authorize filing of the chapter 9 petitions was before the joint committee that there was any discussion whatsoever as to the terms of any plan of adjustment which might be put forward in the chapter 9 proceedings if authorized.

The first written notice the member municipalities received regarding chapter 9 was *after* the chapter 9 petitions were filed. In a letter of September 20, 1993 [36] the project director, Allen Dussalt, referred to filings and commented in part as follows:

> Dear Member Municipality/Project Representative:
>
> As you may be aware, the Vermont and New Hampshire Districts jointly filed for Chapter 9 Bankruptcy protection on September 16. However, the NH/VT Solid Waste Project is still in business and will continue in business under Chapter 9 bankruptcy protection. The reason this action was taken was due to Wheelabrator Environmental Systems refusal to hear the member towns' claims (or agree to binding

209–216). Mr. Fromberger's testimony is rather vague and it is impossible to determine what, if any, specific proposal was put forth by Wheelabrator at that point. It is clear however that Fromberger and Woodman, both of whom supported the assessments and voted against the bankruptcy filings, when the motion was made, had no prior notice that bankruptcy would be considered at the September 15th meeting. They were the only ones to discuss the situation further with Madigan following the September 2, 1993 exchange of correspondence between the parties.

**34.** The question of when and how the committee proposed to access its assessment power, if nec-

essary to resolve the Wheelabrator debt problem, becomes relevant to certain of the issues raised by the motions to dismiss as discussed later in this opinion.

**35.** See footnote 33 *supra*. Fromberger also testified that no other municipality representative to his knowledge had any notice or idea that approval of going into the bankruptcy court would be considered at the meeting, prior to the oral motion following the failure of the vote on the assessments.

**36.** See Exhibit 118A.

arbitration) and threat of termination on September 17 if past due amounts were not paid.

In considering bankruptcy protection, four alternatives presented themselves: 1) be terminated from bringing in waste after September 17 and face a lawsuit by Wheelabrator for damages with continued liability to pay a large portion of the service fee; 2) seek an injunction against Wheelabrator preventing termination with questionable chance of success; 3) accept a previously rejected new contract, and pay $350,000 within sixty days; and 4) seek protection in bankruptcy court and have a neutral third party adjudicate the claims.

I carefully examined these choices with our attorneys and presented them to the Executive Committee. They also evaluated these options with attorney's present and voted 6–4 for bankruptcy protection and made this recommendation to the Joint Committee. The Joint Committee, with the attorneys present, also evaluated the options available and voted 25–6 to seek bankruptcy protection. The New Hampshire and Vermont Districts met separately and voted respectively 14–3 and 11–3 to seek bankruptcy protection. I strongly support this decision as it is our best hope to have a fair and full hearing on disputed amounts of money for each respective party.

This will be the first time we will be on an equal footing with Wheelabrator. We will also be represented by some of the best bankruptcy attorneys in the business when we to negotiate the claims—and the claims can be negotiated under Chapter 9 (assuming Wheelabrator is unsuccessful in their efforts to dismiss the filing).

\* \* \*

## III. MOTIONS TO DISMISS

As noted above, the chapter 9 filings were immediately opposed by Wheelabrator who filed a motion to dismiss on September 20, 1993; by Calvert Funds who filed its objection to the petitions on October 27, 1993; and by the State of New Hampshire who filed an objection to the New Hampshire debtors' petition on October 27, 1993 as well.

Collectively, the motions to dismiss allege the debtors have failed to fulfill the statutory requirements of access to Chapter 9 under § 109(c) and § 921(c) of the Bankruptcy Code. Section 921(c) of the Code refers to the filing of the petition and permits dismissal "if the debtor did not file a petition in good faith or if the petition does not meet the requirements of this title." Section 109(c) of the Bankruptcy Code deals with qualifications required of an entity to be entitled to relief under Chapter 9 of the Code and enumerates a number of specific requirements which will be discussed below.

## IV. ENTITY ENTITLED TO FILE
### (11 U.S.C. § 109(c))

Only certain entities qualify as debtors under Chapter 9. To qualify for Chapter 9 protection, the debtor must affirmatively establish it meets each of the requirements of 11 U.S.C. § 109(c) which provides:

An entity may be a debtor under chapter 9 of this title if and only if such entity—

(1) is a municipality;

(2) is generally authorized to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

(5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

Neither Wheelabrator Claremont Co., L.P., Calvert Municipal Intermediate Funds nor the State of New Hampshire questioned the requirement that the N.H. debtor or the Vt. debtor be shown to be municipalities as defined by the Bankruptcy Code.[37] Wheelabrator Claremont Co., L.P. and Calvert Municipal Intermediate Funds contend the debtors failed to meet each and every one of the remaining prerequisites for Chapter 9 relief. The State of New Hampshire challenges only the NH debtor's authorization under state law to file for bankruptcy relief.[38]

### A. *Is a municipality" (§ 109(c)(1))*

■ The New Hampshire debtor and the Vermont debtor are each statutorily defined as a "body politic and corporate."[39] It is beyond dispute that each debtor is a political subdivision of the state in implementing federally mandated solid waste laws. Under the Bankruptcy Code, a "municipality" is a political subdivision or instrumentality of the state. 11 U.S.C. § 101(40) (Supp.1993). Both the New Hampshire debtor and the Vermont debtor accordingly are municipalities as defined by the Bankruptcy Code.[40]

### B. *"Is Generally Authorized" (§ 109(c)(2))*

■ To answer the *federal* question of whether a municipality is "generally authorized" to be a Chapter 9 debtor, the Court must look to *state* law to find some indication that the municipality has the necessary power to seek relief under the federal Bankruptcy Code[41]. The "generally authorized" language in 11 U.S.C. § 109(c)(2) should be broadly construed to provide municipalities maximum access to Chapter 9 within the constitutional limitations of the Tenth Amendment. *In re City of Bridgeport,* 128 B.R. 688, 695 (Bankr.D.Conn.1991); *In re Pleasant View Utility District of Cheatham Cty.,* 24 B.R. 632, 638 (Bankr.M.D.Tenn. 1982), aff'd 27 B.R. 552.

■ Although the state law need not expressly grant the authority to seek protection under the federal Bankruptcy Code, the state legislature must indicate some basis for inferring an intention to allow the municipality to seek bankruptcy relief. Bankruptcy courts have consistently looked to the enumerated powers granted to the municipality in its enabling statute, and home rule powers if applicable, to demonstrate the requisite legislative intent to seek federal bankruptcy protection.

■ It seems clear that authority to seek bankruptcy protection would be sufficiently implied through a grant of responsibility over fiscal matters combined with a grant of general discretionary powers to implement the powers enumerated. *See In re Villages at Castle Rock Metro. District No. 4,* 145 B.R. 76, 82 (Bankr.D.Colo.1990) (court found authority to file under grant of general powers over finances including to be a party to suits, actions and proceedings, borrow money and incur debt *combined with* statutory grant of power beyond those enumerated "necessary or appropriate to carry out the purpose and intent of the title under which the District was organized"); *In re Pleasant View Utility Dist.,* 24 B.R. at 638 (court found authority

---

**37.** A municipality is defined as a "political subdivision or public agency or instrumentality of the State." 11 U.S.C. § 101(40) (Supp.1993).

**38.** On November 19, 1993, the Court ordered that the State of New Hampshire may intervene as a party in interest with respect to the question of whether or not the NH Debtor is "generally authorized" under New Hampshire state law to file a Chapter 9 petition (Court Doc. No. 60). 11 U.S.C. § 109(c)(2), Bankr.Rule 2018(c).

**39.** Under New Hampshire law, "a regional refuse disposal district ... shall be a body politic and corporate." N.H.Rev.St.Ann. § 53–B:7. Under Vermont law, "the union municipal district shall become a body politic and corporate with the powers incident to a public corporation." Vt.Stat.Ann. tit. 24, § 4865.

**40.** This segment of this Opinion brings to mind the author who wrote a book on "Snakes of the World" that included a chapter on Ireland stating that there are no snakes in Ireland. It seemed more complete that way.

**41.** A municipality has only those powers granted by the state. Unless state law has authorized the municipality to seek protection under federal law, use of the Bankruptcy Code would implicate the Tenth Amendment to the U.S. Constitution.

under grant of broad powers including ability to sue and be sued, to make and enter into contracts and incur debts combined with grant to use "all powers necessary and requisite for the accomplishment for the purpose for which such District is created, capable of being delegated by the legislature"). Federal courts have also found the authorization sufficiently implied within general powers over finances and the power "to sue and be sued" in courts. *See In re City of Bridgeport*, 128 B.R. at 696 (court found authority in home rule statute permitting municipalities power to "sue and be sued and institute, prosecute, maintain and defend any action or proceeding in any court of competent jurisdiction"); *In re Greene County Hsp.*, 59 B.R. 388 (S.D.Miss.1986) (court found board of trustees authorized to seek bankruptcy protection in discretionary powers over finances including money borrowing powers, the power to sue and defend suits, to contract and the power to sell chattel property).

In this case, each debtor has been granted authority to sue or be sued, to incur debts and bear the obligation to repay the debts, and to negotiate contracts which create obligations and debts. Accordingly, this Court finds that both the Vermont debtor and the New Hampshire debtor are "generally authorized" to seek federal bankruptcy protection.

### (1). New Hampshire Debtor

■ The New Hampshire Solid Waste Management Act mandates that each town must provide or assure access to a solid waste facility for its residents. N.H.Rev. Stat.Ann. § 149–M:13 (1990 & Supp.1993). To promote economies of scale, the towns are encouraged to work together through "interlocal cooperative agreements" to implement their responsibilities. *Id.* The New Hampshire debtor is a coalition of 15 towns formed pursuant to one such agreement. N.H.Rev. St.Ann. § 53–B (1991). The enabling statute specifically enumerates the powers and duties of the New Hampshire debtor including the right "to sue and be sued, but only to the same extent and upon the same conditions that a city or town may be sued." N.H.Rev.Stat.Ann. § 53–B:7 (1991). Each New Hampshire town or city is vested with the power to "sue and be sued, prosecute and defend, in any court and elsewhere." N.H.Rev.Stat.Ann. § 31:1 (1991).

The State of New Hampshire has objected to the New Hampshire debtor's bankruptcy petition contending that the New Hampshire debtor is not "generally authorized" to seek bankruptcy relief. The State argues that because New Hampshire is not a home rule state [42], the New Hampshire debtor has only those powers granted by the enabling statute which do not specifically include the power to seek federal bankruptcy protection.[43] In essence, the State is arguing that although it agrees the "generally authorized" standard requires only an affirmative intention by the legislature and not an express grant, nevertheless, because New Hampshire is not a home rule state, such affirmative intention could only be found through an express grant of power to seek bankruptcy relief.

■ The Court finds the State's arguments unpersuasive. The New Hampshire debtor has comprehensive responsibility over its fiscal affairs including express legislative grants of the power to sue and be sued, to incur debt, to issue bonds and to enter contracts. N.H.Rev.St.Ann. § 53–B:7 (1991). The debtor is empowered "to sue and be sued, prosecute and defend, *in any court and elsewhere.*" N.H.Rev.Stat.Ann. § 31:1 (1991) (Emphasis supplied). To be empowered "to sue" means to have the power to commence and carry out a legal action or proceeding against another. *Black's Law Dictionary* 1432 (6th edition 1990). Encompassed in this language is the right to commence a bankruptcy proceeding. Chapter 9 relief is a legal remedy available to the debtor implicit-

---

**42.** The New Hampshire Constitution does authorize limited home rule powers to municipalities but only in the selection of a local form of government within the procedural framework outlined by the Legislature. N.H. Const. pt. 1, art. 39; N.H.Rev.St.Ann. § 49:B (1991) & Supp. 1993).

**43.** The New Hampshire Supreme Court has held that municipalities have "such powers as are expressly granted to them by the legislature and such that are necessarily implied or incidental thereto." *Piper v. Meredith*, 110 N.H. 291, 295, 266 A.2d 103, 106 (1970).

ly granted in the referenced right to sue and be sued. This bankruptcy proceeding is simply an exercise of that statutorily granted right. To hold otherwise, in effect, would require explicit authorization to file a Chapter 9 petition, which clearly Congress rejected [44]. Accordingly, the New Hampshire debtor is "generally authorized" by state law to institute this bankruptcy proceeding.

### (2). Vermont Debtor

■ In Vermont, each municipality is responsible for the storage and disposal of solid waste for its residents, 24 Vt.Stat.Ann. tit. 24, § 2202a(a), and must join a solid waste management District for the purpose of implementation planning of a solid waste plan. 24 V.S.A. § 2202a(c)(1). Solid waste management Districts are formed pursuant to the regulations governing "union municipal Districts." *Id.* The Vermont debtor is a "union municipal District" under Vermont law.

A union municipal District is a "body politic and corporate with the powers incident to a public corporation" and, like the New Hampshire debtor, is empowered to "sue and be sued." [45] As in New Hampshire, Vermont municipalities have only those powers specifically authorized by the legislature and additional powers incident, subordinate or necessary to the exercise thereof. *Hinesburg Sand & Gravel Co. v. Town of Hinesburg,* 135 Vt. 484, 380 A.2d 64 (1977). However, for the same reasons cited above, this Court finds that the authority to initiate a bankruptcy proceeding is implicit in the right to utilize the legal system to resolve disputes which is fundamentally the power granted in the right "to sue and be sued." Accordingly, the Vermont debtor is "generally authorized"

by state law to institute this bankruptcy proceeding.

### C. "Is Insolvent" (§ 109(c)(3))

■ Unless a municipality is "insolvent" it does not qualify for Chapter 9 protection. A municipality is "insolvent" as defined by the Bankruptcy Code if it is:

(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute or:

(ii) unable to pay its debts as they become due.

11 U.S.C. § 101(32)(C). The reference point of the analysis is the date of petition. The debtors argue insolvency under the first prong of the insolvency test, i.e., that at the time of filing bankruptcy, they were "generally not paying" their debts as they became due.

All told, the debtors have 24 creditors with the amounts owed to Wheelabrator Claremont, Inc. being by far and away the most significant of the debts [46]. There is no dispute that the debtors have not paid the amounts billed under the Wheelabrator contract and the evidence supports a finding that a portion of those billings are the subject of a bona fide dispute. However, it is also clear that a large portion of the amounts billed, specifically the amounts due for service fees, are indisputably due and owing and not subject to any right of set-off by the debtors pursuant to the unambiguous terms of the Waste Disposal Contract with Wheelabrator.

In other words, when all the smoke has cleared, the facts support, and the debtors acknowledge, that regardless of previous representations made in the course of negotiations, the sum of $1,133,442.57 [47] of current

---

**44.** See *In re City of Bridgeport,* 128 B.R. 688 (Bankr.D.Conn.1991) for discussion of legislative history of the "generally authorized" language.

**45.** Vt.Stat.Ann. tit. 24 § 4865 reads: "Upon the approval of the agreement by the required number of municipalities ... the union municipal district shall become a body politic and corporate with the powers incident to a public corporation. The district shall be known by the name given in the agreement, by that name may sue and be sued, and may hold and convey real and personal estate for the use of the district."

**46.** According to the schedules, the total undisputed liabilities of the debtors at the date of petition was approximately $1,330,000. Of that amount, approximately $175,000 was due to various trade creditors.

**47.** This amount consists of 1993 service fees owed under the Wheelabrator Contract, not subject to set-off. The amounts are as follows: January—$202,241.52; February—$230,074.13; March—$220,632.60; April—$201,783.64; August—$181,561.33; September (1–15)—$97,-149.37.

amounts outstanding under the Waste Disposal Contract are and were a valid obligation of the debtors due and owing and *not* subject to bona fide dispute. Thus, $1,133,442.57 or 86% of the debtors' scheduled outstanding debt was irrefutably overdue and, in view of the available cash reserves, the debtors were unable to pay. The debtors have shown they were insolvent as defined under 11 U.S.C. § 101(32)(C)(i).

█ I am not persuaded by the argument that, because the debtors did not even attempt to levy a special assessment on the towns to address their cash shortfall, before the debt reached unmanageable proportions, they are precluded from a subsequent assertion of insolvency. To that end Wheelabrator and Claremont Funds argue that the assessment power, which is clearly within each of the debtors' legislative grant and part of each of their adopted District Agreements, is an asset which must be accessed before the debtors can sustain a claim of inability to pay their bills.

Although the Court agrees that the debtors have the power to impose a special assessment on the member towns, upon an appropriate approval, their failure to do so, if relevant at all, has to do with "good faith" issues discussed below, and not with their status of insolvency. In sum, for whatever reason, be it mismanagement or ineptness or strategic negotiation and miscalculation, as of the date of the petition the debtors clearly were in a cash short position and in my view, insolvent under section 101(32)(C)(i) of the Bankruptcy Code. See *In re Villages at*

**48.** But see textual discussion at fn. 16, supra, which indicates more precisely that "Project Management" would propose such a plan.

**49.** There still lurks some question of the "two-stage sidestep" as to finally committing the Districts and the member municipalities to such assessments.

**50.** While not emphasized or pressed in the final arguments, the Debtors did in their briefing argue alternatively that they satisfy the requirements of the fourth option under 11 U.S.C. § 109(c)(5) which requires a showing that the debtor "reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title." 11 U.S.C. § 109(c)(5)(D). The debtors contend that the

*Castle Rock,* 145 B.R. 76; *In re Pleasant View,* 24 B.R. at 639 n. 6.

### D. "Desires to Effect a Plan" (§ 109(c)(4))

█ During the course of the hearing, with direction by the Court, counsel for the debtors submitted a draft plan of adjustment in response to inquiries during the hearings as to whether the debtors had any concrete plan of action in mind.[48] The testimony and record, amplified by the draft plan, establishes the debtors have in fact finally committed themselves with regard to (1) admitting the undisputed portion of the Wheelabrator debt and recognizing their responsibilities under the Waste Disposal Contract; and (2) arguably indicate their willingness to address their cash shortfall by agreeing to "bite the bullet" by mandating special assessments on the municipalities.[49] The debtors accordingly, following the commencement of this case, have shown a desire to try to effectuate a plan of adjustment under Chapter 9 by resort to all of their assets.

### E. "Has Negotiated In Good Faith" (§ 109(c)(5)(B))

█ Under § 109(c)(5) of the Bankruptcy Code the Chapter 9 debtor must demonstrate that it meets at least one of the four alternative requirements set out in subsection (C)(5). In this case the debtors have focused upon subparagraph (B) of the subsection (C)(5) dealing with the duty to negotiate in good faith with creditors prior to Chapter 9 filing.[50]

threat to terminate the Waste Disposal Agreement by Wheelabrator would constitute an avoidable "transfer" within the meaning of § 547 of the Bankruptcy Code. The debtors cite in that regard the cases of *In re Indri,* 126 B.R. 443, 445–46 (Bankr.D.N.J.1991); *In re Sheppard's Dental Centers, Inc.,* 65 B.R. 274, 277 (Bankr. S.D.Fla.1986). However, the cases cited by the debtors do not support their contention in terms of actual holdings. Although there is some dicta in the opinions that arguably could support the contention, neither case has been cited or followed on that point in terms of an actual holding that termination of a contract upon breach or default, prior to bankruptcy, would constitute a transfer for purposes of the avoiding powers under the Bankruptcy Code. The Court finds persuasive in this context the comments of Bankruptcy Judge Martin in *Matter of Jermoo's, Inc.,*

Section 109(c)(5)(B) requires the debtor to demonstrate that it "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least the majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter."

Prior to the convening of the hearings on the dismissal motions, as part of the discovery process, Wheelabrator agreed to stipulate that "the debtors did negotiate in good faith with Wheelabrator with respect to the contract dispute between the two parties prior to the filing of the petition for relief." This stipulation is reflected in this Court's Order denying the debtors' motion to compel production of certain documents from Wheelabrator entered on November 1, 1993 (see Court Doc. No. 48).

The debtors contend that this stipulation with Wheelabrator, which is its major creditor, in effect establishes that it meets the requirement in subsection (c)(5)(B) of § 109 of the Code. Wheelabrator responds that the stipulation made no reference to negotiation in terms of a "plan" as referenced in the statutory provision. Calvert Funds notes that the stipulation does not bind it. Calvert Funds also notes, as in fact is established by the record, that there was no notice to it or any discussion whatsoever with regard to any financial troubles being faced by the debtors at any time before the Chapter 9 petitions were filed. Indeed, the record indicates that a July 26, 1993 letter from the Districts' Business Manager to the Calvert Funds representative made an affirmative representation to the contrary by stating that deflated revenues were not a matter of "pressing concern."[51] It is noted that this optimistic portrayal of the situation was made *after* the debtors had already received the July 19th termination notice from Wheelabrator.

On balance, I do not believe that the stipulation reached during the discovery process precludes Wheelabrator or any other party in interest from raising the question of whether the debtor has met its burden of showing compliance with § 109(c)(5)(B) to be entitled to Chapter 9 relief.

The record on the prebankruptcy negotiations has been set forth in some detail above. That record indicates that notwithstanding repeated demands from Wheelabrator for a concrete plan of action to meet the *undisputable* service fee billings, the debtors chose to waffle and evade any serious attempt to come up with a feasible repayment plan until some four or five weeks before the filing, and then only with a half-hearted effort to finally exercise their assessment power against the member municipalities at the September 15, 1993 meeting.[52]

Under the explicit terms of the contractual arrangements between the parties the debtors had no basis for contending that the service fees could be offset by amounts owing to the debtors from Wheelabrator under other collateral agreements. Nevertheless, the debtors steadfastly refused to acknowledge that fact until the Chapter 9 petitions were filed, and even then only during the course of the dismissal hearings.

38 B.R. 197, 203–204 (Bankr.W.D.Wis.1984), noting how surprising it would be to read the word "transfer" in the bankruptcy avoiding power context to include justifiable prebankruptcy termination of executory contracts. To the extent therefore that the debtors still contend that they "reasonably believed" that Wheelabrator might obtain a transfer that was avoidable under § 547 of the Code I disagree and find that they had no basis for any such reasonable belief in the circumstances.

51. See Exhibit 207—July 26, 1993 letter which states in relevant part:

Since this is our mid-year report, I have included an additional report, "Current Year Budget Status Report" which includes percentages of our planned budget. Revenues are at 47.83% of our projection, which means we are falling short. Expenditures are 58.53% accounted for, which means in total we have a 10.70% problem.

Concern is not terribly pressing at this point. We still hope for waste tonnage to increase and we continue to look for ways of cutting costs.

52. Representatives of the debtors testified at the hearings as to various attempts to obtain bank financing during 1993 but those attempts were half-hearted and ineffectual also. The debtors were repeatedly told by the banks and other financial institutions who might approve such borrowings that the debtors first had to in effect get their house in order by exercising their special assessment powers against the member municipalities before the lenders would consider any further financing.

A commercial party can hardly "negotiate in good faith" regarding unpaid obligations if it chooses to ignore clear, unambiguous contractual rights of the other party and, more importantly, refuses to acknowledge or throw into the negotiating equations a large and significant asset that it holds. In the present case, the most significant asset held by the Districts was their power to assess the member municipalities for the unpaid service fees and thus in effect access the borrowing or taxing powers of those municipalities to meet the debtors' obligations.

The Court recognizes that the case law and treatise commentary indicate that municipal debtors coming into the bankruptcy courts under Chapter 9 do not have to demonstrate that they have fully exercised their taxing powers to the maximum extent possible. *In re Ellicott School Bldg. Authority*, 150 B.R. 261, 265 (Bankr.D.Colo.1992); *In re Villages at Castle Rock*, 145 B.R. at 84; *In re Pleasant View Utility Dist.*, 24 B.R. at 639 n. 6; 4 *Collier on Bankruptcy* ¶ 900.03 (15th ed.). However, what is unique about the present case is that these debtors have *never* exercised their assessment powers prior to coming into the bankruptcy court. In fact, they ignored any timely resort to their primary asset resulting in the substantial buildup in the unpaid service fee obligations. Then, in their negotiations with Wheelabrator, they attempted to ignore that primary asset until forced to react by the Wheelabrator termination notice.

■ Under the statutory provision the Districts were also required to negotiate regarding a "plan" to deal with their financial problems. The record establishes that at no time prior to the Chapter 9 filing did the Districts set out for Wheelabrator, or any other creditor for that matter, a comprehensive workout plan dealing with all of their liabilities and all of their assets in terms comparable to a plan of adjustment that could be effectuated under Chapter 9 of the Bankruptcy Code. While the statutory requirement does not require a formal plan as such, some sort of comprehensive plan is required as one of the "screening factors" to avoid a too early and rapid resort to the bankruptcy courts by municipalities. 4 *Collier on Bankruptcy* par. 900.03 (15th ed.); 6 *Norton Bankr.L. & Prac.* § 136.25 (1993). It has been held that good faith negotiations per se are not sufficient to meet the statutory requirement unless they revolve around the negotiating of the terms of a plan that could be effectuated if resort is required to Chapter 9 of the Bankruptcy Code. *In re Cottonwood Water and Sanitation District*, 138 B.R. 973, 974, 979 (Bankr.D.Colo.1992) (opinion includes extensive discussion of legislative history). Judge Matheson there concluded:

In general, the Bankruptcy Code, as remedial legislation, should be broadly construed in order to provide the intended relief. However, municipal bankruptcies involve significant problems which are not encountered in the private sector. Important constitutional issues arise when a municipality enters the bankruptcy arena. Recognizing these problems, Congress consciously sought "to limit accessibility to the bankruptcy court" by municipalities. H.R. Conference Report, 94–938, p. 10, U.S.Code Cong. & Admin.News 1976, p. 539. One way to do so was to require the municipal entity, before rushing to this Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the Code.

The conditioned entry to this Court which is afforded by section 109(c) recognizes that the negotiating posture of the parties changes once the bankruptcy petition is filed. It is one thing to negotiate when the debtor is being confronted with the pressures of defaults on public debt and the requirement of certifying ever-increasing mill levies in order to provide for the payment of such debt. It is another when the entity is being protected by the stay of section 362 of the Code and the bondholders are being faced with an indeterminate period of nonpayment of their bonds. The "creditor protection" provided by section 109(c)(5), as interpreted by this Court, insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor

before their rights are further impaired by the provisions of section 362 of the Code.[53]

138 B.R. at 979.

The *Cottonwood* decision has been followed by Judge Cordova in *In re Ellicott School Building Authority*, 150 B.R. 261. The court there dismissed the chapter 9 filing due to the failure to negotiate the possible terms of a plan of adjustment and also noted that the authority had not taken formal action to try to collect certain rent obligations due to it under the lease transaction in question. The Court concluded, as did the *Cottonwood* court, that in order to meet the § 109(c)(5)(B) requirement the municipal debtor must "be prepared to demonstrate that it engaged in good faith negotiations with its creditors concerning the possible terms of a plan to be effected pursuant to § 941 of the Bankruptcy Code." 150 B.R. at 266.

The cases cited by the Districts as supporting their assertion that they satisfied the prebankruptcy negotiation requirement, *In re Villages At Castle Rock*, 145 B.R. 76; *In re Pleasant View Utility Dist.*, 24 B.R. 632, involve significantly different and more intensive negotiations between the municipalities and their creditors prior to the chapter 9 filings. Moreover, the negotiations dealt with all the liabilities and assets of the municipalities involved.

In the present case the Districts responded in what can only be described as a lackadaisical pace to the termination notice given by Wheelabrator in its July 19th letter.[54] The question of approving assessments on the member municipalities to meet the obligation to Wheelabrator on the unpaid service fees was not even presented for action to the joint committee and the District representatives until September 15, two days before the termination date. It is striking that there is no evidence in this record that representatives of the Districts asked Wheelabrator the obvious question as to whether *if* the Districts authorized assessment on the member municipalities at the September 15th meeting Wheelabrator would in turn agree to extend the termination deadline to allow the time necessary to obtain required financing and/or tax levies to commence the payments to Wheelabrator.

 Considering all of the foregoing findings I conclude that the debtors have failed to meet their burden of showing that they did negotiate in good faith with regard to a plan within the meaning and purpose of § 109(c)(5)(B) of the Bankruptcy Code.[55]

## V. PETITION FILED IN GOOD FAITH
### (11 U.S.C. § 921(c))

 It is within the discretion of the Court to dismiss a petition if it finds the debtor did not file the petition in good faith.[56]

---

**53.** The Court in the *Cottonwood* case reached its decision even though, as is true in the present case, the objecting creditors acknowledged that there were prepetition negotiations between the creditors and the debtor that were done in good faith. 138 B.R. at 974.

**54.** This pace is probably best explained by the consistent and repeated assertion by Allen Dussault, the project manager, that Wheelabrator adamantly refused to negotiate any appropriate workout of the financial problems between itself and the Districts. He apparently believed that any further negotiation would likewise be fruitless. There is no support in the record for Dussault's assertion that Wheelabrator refused to negotiate in an appropriate manner other than in terms of a gross oversimplification of the situation involved. Wheelabrator simply refused to "negotiate against itself" until the Districts presented a convincing and concrete plan of action that in the real world would be authorized by the member municipality representatives as a binding proposal.

**55.** The Districts both in their briefs and during the dismissal hearings argued at various times that further negotiations with creditors was "impracticable" if they could not get an agreement with Wheelabrator as to the debt obligations owing between the parties. To the extent that this contention suggests an alternative ground under § 109(c)(5)(C) I do not believe that "impracticable" is intended to be applied in that context. As the legislative history indicates, that provision was enacted in 1976 during the time of an impending municipal bankruptcy filing by the City of New York and was intended to cover situations in which a very large body of creditors would render prefiling negotiations impractical. *2 Collier on Bankruptcy* par. 900.03, p. 900–24 (15th Ed.1993).

**56.** Section 921(c) reads in relevant part, the court "may dismiss the petition if the debtor did not file the petition in good faith." As a preliminary matter, while the "good faith filing" requirement of § 921(c) is distinct from the "good

80

4 *Collier on Bankruptcy* ¶ 921.04 (15th ed.) Good faith is not defined in the Bankruptcy Code nor is there any meaningful discussion of the Congressional intent behind the good faith requirement found in the legislative history of this section. Although Chapter 9 is the only chapter which currently expressly mentions good faith as a prerequisite to filing, the existence of the requirement has been either stated by the legislature or implied by the courts throughout the history of bankruptcy statutes. The institution of a "good faith" requirement allows a useful means for the Court to preserve the protection of the Code for those for which it was actually intended. 6 *Collier on Bankruptcy,* par. 6.07(1), at 1018–19 (14th Ed.1969); *In the Matter of Metropolitan Realty Corp.,* 433 F.2d 676, 678 (5th Cir.1970), *cert. denied* 401 U.S. 1008, 91 S.Ct. 1251, 28 L.Ed.2d 544 (1971).

The Court finds the extensive case law under Sections 141 and 146 of Chapter X of the prior Bankruptcy Act of 1898, as amended, which required an affirmative finding by the court of good faith in the filing of a corporate reorganization petition, as being instructive as background for construing the explicit provision now in chapter 9 of the Code.

Sections 141 and 146 of the prior Act, which were added by the Chandler Act amendments of 1938, provided as follows:

Sec. 141. Upon the filing of a petition by a debtor, the judge shall enter an order approving the petition, if satisfied that it complies with the requirements of this chapter and has been filed in good faith, or dismissing it if not so satisfied.

Sec. 146. Without limiting the generality of the meaning of the term "good faith", a petition shall be deemed not to be filed in good faith if—

(1) the petitioning creditors have acquired their claims for the purpose of filing the petition; or

(2) adequate relief would be obtainable by a debtor's petition under the provisions of chapter XI of this Act; or

(3) it is unreasonable to expect that a plan of reorganization can be effected; or

(4) a prior proceeding is pending in any court and it appears that the interests of creditors and stockholders would be best subserved in such prior proceeding.

Bankr.Act §§ 141, 146, 11 U.S.C. §§ 541, 546 (1976).

The language and history of these sections indicates the definition of good faith was more a legislative guide than a limitation to the conditions expressed.[57] The primary function of the good faith requirement has always been to ensure the integrity of the reorganization process by limiting access to its protection to those situations for which it was intended. *In the Matter of Metropolitan Realty Corp.,* 433 F.2d 676 (good faith implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose.) *quoting In re Southern Land Title Corp.,* 301 F.Supp. 379, 428 (E.D.La.1968).

The case law under §§ 141 and 146 of the prior Act often involved the particular provision in § 146(3) specifying that a petition would be deemed *not* in good faith if "it is unreasonable to expect that a plan of reorganization can be effected." *See e.g., Fidelity Assurance Ass'n v. Sims,* 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032 (1943); *In re Vento Development Corp.,* 560 F.2d 2 (1st Cir.1977); *In re DCA Development Corp.,* 360 F.Supp. 162 (D.Mass.1973); *In re Agregados de Manati, Inc.,* 357 F.Supp. 1263 (D.P.R.1973); *In re Ware Metal Products,* 42 F.Supp. 538 (D.Mass.1941). The Third Circuit, in *In re Business Finance Corp.,* 451 F.2d 829, 833 (3rd Cir.1971), summarized the requirement as follows:

---

faith negotiations" requirement of § 109(c)(5)(B), these statutory provisions do involve considerable overlapping from an evidentiary standpoint. However, existence of both prerequisites to filing indicates Congress necessarily intended separate findings for each statutory requirement.

**57.** For general discussion of history and interpretation of good faith under the Bankruptcy Act see Collier on Bankruptcy (14th Ed.), § 6.07, p. 1040–1054.

Good faith imports an honest intention on the part of the petitioner to effect a reorganization, together with a need for and possibility of effecting it, and, in determining whether a Chapter X proceeding was filed in good faith the Court is required only to ascertain whether it was reasonable to expect that a plan could be effected; that there was opportunity and need for reorganization; and that the petition was filed with honest intention of effecting it and not for the purpose of hindering and delaying creditors."

██ However, under the Act, the test of good faith did not always turn on the subjective sincerity or insincerity of the debtor. *In the Matter of REA Holding Corp.,* 558 F.2d 1127, 1129 (2nd Cir.1977) (the bankruptcy judge need not look "behind" the petition to discover an improper or unethical purpose to determine good faith). Rather, to find good faith, the Court looked to the facts to determine whether the "financial, economic and legal situation of the debtor is one within the contemplation of Chapter X." *In re Lela & Co., Inc.,* 551 F.2d 399, 408 (D.C.Cir.1977). Thus, under this test, a "sincere" debtor could file a petition in bad faith if the facts as presented demonstrated that the petition was not filed for reasons consistent with the intended purposes of the Bankruptcy Code. See, e.g., *In re Diversey Hotel Corporation,* 165 F.2d 655, 658 (7th Cir.1948); *In re Ware Metal Products,* 42 F.Supp. at 541.

Following the enactment of the Bankruptcy Code in 1978 the courts continued to find a "good faith" filing requirement implicit in the "for cause" dismissal provision of § 1112 of the new Code, notwithstanding the absence of any explicit provision in the new Chapter 11 general reorganization chapter. See, e.g., *In re The Bible Speaks,* 65 B.R. 415 (Bankr.D.Mass.1986); *In re Victory Construction,* 9 B.R. 549 (Bankr.C.D.Cal.1981). This Court itself has so ruled and has held that a Chapter 11 petition may be dismissed at the outset as not having been filed in good faith on various grounds indicating that the petition was filed for reasons inconsistent with the intended purpose of the reorganization chapter. See, e.g., *In re Marsh Fairway,* 148 B.R. 721 (Bankr.D.N.H.1992) (plan for litigation not reorganization); *In re Sirius Systems, Inc.,* 112 B.R. 50 (Bankr.D.N.H. 1990) (share holders squabble); *In re Nesenkeag,* 131 B.R. 246 (Bankr.D.N.H.1991) (two-party lawsuit); *In re Assembled Interests Corp.,* 117 B.R. 31 (Bankr.D.N.H.1990) (new debtor syndrome). Cf. *In re Gonic Realty Trust,* 50 B.R. 710, 714 (Bankr. D.N.H.1985) (dicta) (inequitable to permit a "partial entity" to resolve liability problems without subjecting "all assets relevant to the issue" to the reorganization process).

In summary, the case law on the question of good faith in filing a bankruptcy petition, both under the Act and the Code, has evolved into two complimentary lines of authority: (1) dismissals because there were no reasonable prospects for reorganization and the petition served only to hinder and delay creditors; and (2) dismissals because for other reasons the filing is deemed to be inappropriate, as being at odds with the legislatively intended scope of the chapter involved. Generally, dismissals in the first category can be termed to be on "economic" viability grounds and dismissals in the second category can be termed to be on "non-economic" policy grounds.[58] With this background, this Court must address how the specific requirement for a showing of good faith in the filing of a petition should be construed in the Chapter 9 context under the present Bankruptcy Code.

This Court, like other courts before it, finds the pre-Code judicial development of the definition of "good faith" to provide persuasive guidance in construing the Congressional intent in adding a specific "good faith filing" under Chapter 9. *See Matter of Little Creek Development Co.,* 779 F.2d 1068 (5th Cir.1986) (citing pre-Code good faith cases in context of Chapter 11). At least one other Court has adopted the analysis of courts in cases under Chapter 11 in defining the good faith requirement under Chapter 9. The court in *In re Villages at Castle Rock,* stated:

---

58. See *Goodman v. Michael,* 280 F.2d 106 (1st Cir.1960) (in Chapter X case court in effect ruled that a non-economic policy consideration, i.e., shareholders just litigating for control of the stock of the corporation, would support dismissal for lack of good faith).

In the Chapter 11 context, 'good faith' has been described as a requirement which 'prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes.' Determining whether a petition has been filed in good faith requires an evaluation of a debtor's 'financial condition, motives, and the local financial realities.' These comments would appear to be equally applicable, at least in part, to a Chapter 9 petition.

145 B.R. at 81 (citations omitted).

■ In the present case, the decision to file bankruptcy was not the end result of a considered debate, weighing the benefits and consequences of the petition. It was not a final alternative chosen as a last resort. On the contrary, the option was not on the written agenda and was presented to the District representatives by oral motion at the meeting. There is no evidence of any meaningful discussion of the what type of plan might be appropriate under Chapter 9 by the member municipalities or their representatives before, or even immediately after, the final vote was cast.

The debtors' immediate post-filing actions tend to confirm that the bankruptcy option was chosen with no real thought or sincere intention of debt adjustment in an overall plan sense. Instead, the decision appears to be a late hour litigation tactic to hold off Wheelabrator's threatened shut-out and an attempt to position the Districts to force some compromises. In particular, the Court notes the Project Manager's letter of September 20, 1993, and the later letter of September 30, 1993, made no reference to any thoughts of plans or debt restructuring.

The debtors created their own problem of a massive debt by signing a contract and then refusing to face up to their obligations under that contract with steadfast refusal to exercise their assessment powers. Even when the final opportunity was presented, not 48 hours before the termination deadline, the debtors still deliberately refrained from accessing their primary asset to attempt to resolve their financial problems. They opted instead to continue their "two-step sidestep" by seeking protection of the Bankruptcy Code. If this case can pass muster as a good faith filing it is difficult to imagine any municipality that could not "engineer its way into the bankruptcy courts" by simply refraining from paying its debts from available assets and then claiming the resulting inability to pay debts as they came due justified bankruptcy court relief. The possibilities for abuse and transfer of municipal corporate litigation from the state courts to the bankruptcy courts is easily foreseeable.

Considering all of the foregoing, the Court concludes that the filing of these Chapter 9 petitions were not in good faith within the meaning and purpose of the provisions of § 921(c) of the Bankruptcy Code. In my judgment Congress did not intend that a municipality that made *no* effort to use its assessment or taxing powers to meet its obligations before filing nevertheless could come into the bankruptcy courts to resolve what is essentially a contractual dispute with one of its creditors.

## VI. CONCLUSION

The hurdles to Chapter 9 were undoubtedly designed to prevent the "capricious filing" of municipal petitions. 4 *Collier on Bankruptcy* par. 900.03 (15th ed.); 6 *Norton Bankr. L. & Prac.* § 136.25 (1993) ("It is the policy of the Bankruptcy Code that a Chapter 9 filing should be considered only as a last resort, after an out-of-court attempt to avoid bankruptcy has failed.") Municipal bankruptcy is quite unlike bankruptcy for individuals or private corporations. The bankruptcy court's jurisdiction should not be exercised lightly in Chapter 9 cases, in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment. Considering the bankruptcy court's severely limited control over the debtor, once the petition is approved, access to Chapter 9 relief has been designed to be an intentionally difficult task.[59]

---

59. In this case particularly, where the Chairman of the Joint Committee himself testified that

many of the Districts' problems stemmed from lack of effective and continuing management, it

Although the law is rarely painted in strokes of black and white, there are occasionally cases and situations in which there is a need and justification for a "bright line" rule on a particular legal question. This is such a situation. Municipalities that wish to come into bankruptcy under Chapter 9 in my judgment must, at a minimum, demonstrate that before filing they either used their assessment or taxing powers to a reasonable extent, or in their pre-petition negotiations have committed to the use of those powers as part of a comprehensive and appropriate work out of their financial problems.[60] If they have undertaken that endeavor in good faith, and nevertheless have failed to reach an accommodation with their creditors, they then may be entitled to Chapter 9 relief if they are otherwise qualified.

The debtors in the present case have failed to establish the requisites for Chapter 9 relief, both under § 109(c) and § 921(c), and therefore their petitions *must* be dismissed under the former and *should* be dismissed under the latter. An order to that effect shall be entered separately.

## ANNEX 1

### STATEMENT OF UNDISPUTED INDEBTEDNESS

NOW COME Southern Windsor/Windham Counties Solid Waste Management District (the "Vermont District") and Sullivan County Regional Refuse Disposal District (the "New Hampshire District"; collectively, the "Debtors"), by and through their duly authorized representatives, and state as follows:

For the purposes and within the scope defined by this Honorable Court at the November 17, 1993 hearing, the Debtors are indebted to Wheelabrator Claremont L.P., Inc. in the following amount:

| Service Fees–1993 | Undisputed Amount |
|---|---|
| January | $ 202,241.54 |
| February | $ 230,074.13 |
| March | $ 220,632.60 |
| April | $ 201,783.64 |
| August | $ 181,561.33 |
| September (1 to 15) | $ 97,149.37 |
| TOTAL | $1,133,442.61 |

(the "Wheelabrator Indebtedness"). The Debtors further state that the Wheelabrator Indebtedness is undisputed by the Debtors and constitutes a valid obligation of the Debtors due and owing to Wheelabrator. The Debtors assert that the Debtors have not paid the Wheelabrator Indebtedness solely because the Debtors have lacked sufficient funds to make said payments.

November 24, 1993

Respectfully submitted,

Southern Windsor/Windham Counties Solid Waste Management District

By: (s) Joseph Fromberger

Joseph Fromberger

Chairman Vermont District

Chairman of the Joint Meeting

NH/VT Solid Waste Project

and

Sullivan County Regional Refuse Disposal District

By: (s) Robert Woodman

Robert Woodman

Chairman of New Hampshire District

Chairman of the Executive Committee

NH/VT Solid Waste Project

---

has to be recognized that this Court has no power to address the question of ineffectual or incompetent management by appointing a trustee when the proceeding is under Chapter 9, as it would have under § 1104 of Chapter 11.

**60.** The Court notes in this regard the unique nature of these District municipalities, which do not directly access the taxing or borrowing powers of their member municipalities, but must act through the two-stage procedure described above in which the member towns, acting through their individual representatives, have the final say as to whether assessments approved by the Joint Committee of the Districts, acting as the representative of the towns, have approved. Such a situation can, as here, lead to a stalemate in imposing any assessments. This intensifies the need to place maximum emphasis upon the good faith negotiation and good faith filing requirements under Chapter 9 to assure that the member municipalities are just as much involved in the negotiations and decision to file as the Districts themselves.

## ANNEX 2

AMENDED SCHEDULE F - CREDITORS, HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing, address, including zip code, and account number, if any, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

MAR 16 1994

US BANKRUPTCY COURT

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule M - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, unliquidated, or disputed, so state.

Report the total of claims listed on each sheet in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules.

[ ] Check this box if debtor has no creditors holding unsecured nonpriority claims to report on this Schedule F.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE | CODEBTOR | H W J C | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | AMOUNT OF CLAIM. IF CLAIM IS CONTINGENT, UNLIQUIDATED, OR DISPUTED, SO STATE. |
|---|---|---|---|---|
| ACCOUNT NO. Wheelobrator Claremont Co., Inc. R.D. 2, Grissom Lane Claremont, NH. 03743 | | | Waste Disposal Agreement - April 12, 1985 | $1,133,442.61 |
| ACCOUNT NO. | | | | |
| ACCOUNT NO. | | | | |
| ACCOUNT NO. | | | | |
| ACCOUNT NO. | | | | |

_____ Continuation Sheets attached

Subtotal -> $ _____
(Total of this page)
Total -> $ _____
(use only on last page of completed Schedule F.)
(Report total also on Summary of Schedules)

Page 1 of 1 pages to Amended Schedule F

## ANNEX 3

### NH/VT SOLID WASTE MANAGEMENT PROJECT
### DRAFT PLAN OF ADJUSTMENT
### FOR PRESENTATION TO
### FEDERAL BANKRUPTCY COURT
### MANCHESTER, NH
### 11/12/93

*Executive Summary*

A. Project Management proposes clearing all outstanding pre-petition trade creditors by end 1995/early 1996. Proposed payment schedule summary is as follows:

| | Opening Balance | Jan./June 1994 | July/Dec. 1994 | Jan./June 1995 | July/Dec. 1995 |
|---|---|---|---|---|---|
| **Pre-petition Trade Creditors:** | | | | | |
| • Wheelabrator | $(1,136,000) | $ 200,000 | $ 250,000 | $ 300,000 | $386,000 |
| • Others | $( 174,000) | $ 40,000 | $ 40,000 | $ 40,000 | $ 54,000 |
| Balance Outstanding | $(1,310,000) | $(1,070,000) | $(780,000) | $(440,000) | $ 0 |

B. Additional funds will be generated through:
 - i. Raising an assessment in 1994 and 1995 for $250,000 in each year.
 - ii. Sale of surplus-to-needs land for approximate net gain of $250,000.
 - iii. Anticipated positive cash inflow from settlement of disputed receivables with Wheelabrator.
 - iv. Contracting to take garbage from non-member towns.

C. Improving collections from average of 90 day outstanding to 60 day outstanding.

*Cash Flow*

A. Collections of Accounts Receivable. Project Management are anticipating implementing a more disciplined approach to the collection of outstanding A/R's from an approximately 90 days down to 60 days. This may require the project to invoice the member towns directly instead of billing the private haulers.

B. Project Management anticipate that they will have to keep all payables current while in bankruptcy.

C. The raising of the assessment in July of 1994 and 1995 will be largely used to pay pre-petition trade creditors.

*Revenues*

A. An independent Ph.D. Economist forecasts no growth in tonnage from existing member towns. He anticipates that levels will remain at 42,000 per annum range.

B. Tipping fees, at $96.50 per ton, are already among the highest in the country.

C. Growth in tonnage delivered to the incinerator may come from contracting with non-member towns to make up for the shortfall between G.A.T. of 47,000 and presently delivered amounts of 42,000. However, this highly speculative at this time and, therefore, no actual allowance has been made for possible additional amounts.

*Additional Sources of Revenue*

A. Project Management proposes to obtain additional revenue from the following sources:
 - i. Raising of an assessment on member towns for $250,000 to be received in or around July 1994. This is reported to be the earliest possible date due to member towns budgetary procedures.
 - ii. The Project owns over 60 acres at Grissom Lane, of which approx. 40 acres are surplus to requirements. Project management proposes to sell this land, which is zoned for industrial use and use the proceeds to pay down pre-petition trade creditors.
 - iii. The Project Management further proposes to raise an additional $250,000 by way of an assessment on the member towns to be received in or around July 1995.

B. The Project has outstanding claims against Wheelabrator, the full payment of which are disputed by Wheelabrator. However, Wheelabrator officials have acknowledged that there is some merit to the claims being made by the Project and these monies will be used, in part, to clear trade creditors.

*Expenses*

A. Expenses at the project offices are already well controlled and there is little room to improve efficiencies that will result in any major savings.

B. Full time staffing is maintained at a level of four administrative staff and one operational employee at the landfill site.

C. For the period to end of 1993 and parts of 1994 expenses on legal and accounting services are expected to be at a higher level due to the bankruptcy proceedings, but will drop off considerably into 1995 and beyond.

ANNEX 4

| TOWN | 1992 Tonnage | Percent Per State | 830,000 Assessment |
|---|---|---|---|
| Acworth & Langdon | 449.70 | 1.07% | 8873.71 |
| Claremont | 9557.13 | 22.72% | 188586.19 |
| Cornish | 315.26 | 0.75% | 6220.87 |
| Croydon | 225.70 | 0.54% | 4453.63 |
| Goshen | 273.30 | 0.65% | 5392.90 |
| Grantham | 704.60 | 1.68% | 13903.53 |
| Lempster | 340.20 | 0.81% | 6713.00 |
| Meredith & C. Harbor | 3320.20 | 7.89% | 65515.89 |
| New London | 2100.40 | 4.99% | 41446.17 |
| Newport | 4128.72 | 9.82% | 81470.02 |
| Plainfield | 738.40 | 1.76% | 14570.49 |
| Spfld. & Sunapee | 1504.20 | 3.58% | 29681.65 |
| | | | |
| NH Total | 23657.81 | 56.24% | 466828.04 |
| | | | |
| Andover | 70.80 | 0.17% | 1397.06 |
| Baltimore | 24.20 | 0.06% | 477.53 |
| Cavendish | 670.00 | 1.59% | 13220.78 |
| Chester | 1265.20 | 3.01% | 24965.58 |
| Grafton | 214.40 | 0.51% | 4230.65 |
| Ludlow | 3294.10 | 7.83% | 65000.87 |
| Plymouth | 236.55 | 0.56% | 4667.73 |
| Reading | 199.50 | 0.47% | 3936.64 |
| Rockingham | 2371.40 | 5.64% | 46793.68 |
| Springfield | 5241.80 | 12.46% | 103433.89 |
| Ascutney & Wtrsfld. | 703.10 | 1.67% | 13873.93 |
| West Windsor | 226.40 | 0.54% | 4467.44 |
| Westminster | 2221.70 | 5.28% | 43839.72 |
| Windsor | 1665.60 | 3.96% | 32866.47 |
| | | | |
| VT Total | 18404.75 | 43.76% | 363171.96 |
| | | | |
| Grand Total | 42062.56 | 100.00% | 830,000.00 |